# Illinois Official Reports

## Appellate Court

---

**_In re Commitment of Tenorio_, 2020 IL App (1st) 182608**

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF LUIS TENORIO (The People of the State of Illinois, Petitioner-Appellee, v. Luis Tenorio, Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>No. 1-18-2608 |
| Filed | March 12, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-80012; the Hon. Steven G. Watkins, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael R. Johnson, Kate E. Levine, and Ian C. Barnes, of Johnson & Levine LLC, of Chicago, for appellant.<br><br>Kwame Raoul, Attorney General, of Chicago (Michael M. Glick and Nicholas Moeller, Assistant Attorneys General, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1        After a trial, respondent Luis Tenorio was found by a jury to be a sexually violent person under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2016)) and was ordered committed to institutional care in a secure facility. Respondent appeals, claiming that the State used his prior convictions as substantive evidence against him in its opening, closing, and rebuttal and, consequently, respondent was unable to receive a fair trial. For the reasons set forth below, we affirm.

¶ 2                                        BACKGROUND

¶ 3        On October 22, 2007, the State filed a petition to civilly commit respondent as a sexually violent person under the SVP Act,[1] alleging that respondent had been convicted of aggravated criminal sexual abuse, a sexually violent offense under the SVP Act, for which he served five years in the Illinois Department of Corrections (IDOC). The petition alleged that respondent suffered from "Pedophilic Disorder, Sexually Attracted to Females," a mental disorder that predisposed respondent to sexual violence, and further alleged that respondent was dangerous because his mental disorders made it substantially probable that he would engage in future acts of sexual violence. The State's petition was supported by an evaluation conducted by Dr. John Arroyo, a licensed clinical psychologist.[2]

¶ 4        Trial on the State's petition began on August 7, 2017. As the opening statements and closing arguments are at issue on appeal, we discuss them in some depth. Prior to the State's opening statement, the court reminded the jury that opening statements were not evidence but were merely statements by the attorneys as to what they expected the evidence to show. The State then began its opening by informing the jury that they would hear testimony from Dr. Arroyo and Dr. Edward Smith, who would opine that respondent would be a repeat offender and was a sexually violent person. The State continued:

        "And that opinion was based on several factors.

             First, they considered his criminal history and that helped them to develop an idea of what drives him, what moves him, what motivates him, what makes him behave the way he does. So they looked at the history."

The State then began relating the details of a 1999 arrest, and the defense objected, claiming that the State was using the basis of the experts' opinion testimony as substantive evidence. The court then addressed the jury:

        "Ladies and Gentlemen, these are just arguments of what the attorneys expect the evidence to show. It is not evidence.

             Continue."

---

        [1]The petition was amended on June 19, 2015, to update respondent's diagnosis under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), which was published in May 2013; the original petition contained a diagnosis based on the Diagnostic and Statistical Manual of Mental Disorders-IV-TR (DSM-IV-TR).

        [2]The original evaluation report, dated August 2, 2012, is not attached to the amended petition, which contains only a May 6, 2015, addendum to the report. However, the original report is contained elsewhere in the record.

The State continued, again prefacing its comments by stating:

"And in formulating his opinion, he used these facts to see what drives him, what patterns of behavior drive him."

The State then proceeded to discuss two 1999 incidents, with the defense objecting several times. The State concluded its description of the 1999 incidents and moved on to two incidents in 2000 by saying:

"He still has these urges and the doctor is using these urges in forming his opinion.

Then we move on to 2000, and in that case, the respondent's behavior seems to escalate. He has no control over his behavior and the doctors use this in forming their opinion."

¶ 5    The State then discussed incidents in 2000 and 2001, over the defense's continued objections, and concluded by saying:

"He's unable to control his urges.

So after that, the respondent still cannot control his urges and you will hear the doctors testify that this pattern, this escalation of behavior shows you the sexual urges and the sexual drive is so strong that even supervision and other restraints have not prevented that behavior."

The State then continued to a 2000 offense, with the defense objecting. After several more objections, the court ordered the attorneys to approach and discussed the defense's objections:

"THE COURT: What are you objecting to?

DEFENSE COUNSEL: There has not been a single mention of the fact that this is all information that is based off of records. This is not evidence that's coming in. This is not—

THE COURT: These are opening statements, Counsel.

DEFENSE COUNSEL: Judge, I would refer you to *In re* the Commitment of Kathryn. This is the same issue that we brought up there that was reversible error.

ASSISTANT ATTORNEY GENERAL [(AAG)]: It is not. What counsel is referring to—

* * *

The basis of his opinion [*sic*] is the fact that this is being used for the basis of his opinion and that has been said over and over again. Now, what he uses for the basis of his opinion can also be testified to and that is all we're saying, what the evidence will show.

Counsel is referring to a case that has nothing to [do] with this one and simply they were using the same factual allegations as substantive evidence and we are using the factual allegations to show how it forms the opinion. That's the difference. That's what's being done. That's what's being argued.

DEFENSE COUNSEL: Each of these basis [*sic*] of information that are being argued as if it is fact as if there's information that will be provided in testimony and provided at trial, and there won't be.

THE COURT: She's making an opening statement on what these doctors are basing their opinions on.

DEFENSE COUNSEL: But she hasn't said that yet.

- 3 -

THE COURT: She has said that.

AAG: Repeatedly.

THE COURT: Yes, she has.

DEFENSE COUNSEL: Well, I will have a continuing objection then to the narrative type."

¶ 6 The State then returned to discussing respondent's history, prefacing discussion of a 2002 incident by saying:

"And in 2002, there was a further escalation of behavior and the doctors relied on this not only to show the behavior itself, the urges, but the escalation, the change and the pattern."

The State noted that respondent was incarcerated for this offense and stated:

"At that point, the respondent is arrested and he's incarcerated and given parole. Now, this is a penalty that he's given and the doctors will tell you that his inability to even comply with supervision and other penalties also is used in the forming of their opinion."

¶ 7 The State continued:

"Now, while he was on parole, the respondent goes yet to another girl and attempts to approach her to get her information following her. That little girl flees in fear, as the reports indicate, and the doctors relied on that, that while even on parole, he's unable to control this urge to approach these young girls. He's then incarcerated an additional time. And after that incarceration, he's released. And even after that, these urges, these behaviors, this desire to approach these young girls continues and the doctors will explain how that continuation after all of these years from 1999 until 2005 shows a pattern of behavior.

And then in 2005, he again exhibits similar behavior where he's convicted of an offense where he's again chasing a young girl, grabbing and groping her on her genitals showing a pattern of behavior. And after all of these things, the doctors use these facts and opinions and these things that they've learned from reading the records to show that he has an urge, an interest, behavior that he simply cannot control. Self-control is lacking."

¶ 8 During its opening, the defense focused on the fact that the State had the burden of proving respondent to be a sexually violent person (SVP) beyond a reasonable doubt and argued that the State would not be able to satisfy its burden.

¶ 9 During the trial, the State called two clinical psychologists as witnesses: Dr. Arroyo and Dr. Smith. Dr. Arroyo testified that he was employed by Wexford Health Source, a company that was contracted to provide the IDOC with evaluations to determine whether certain individuals satisfied the criteria to be considered SVPs under the SVP Act. Dr. Arroyo testified that, as part of his work history, he had worked with individuals who were developmentally delayed or otherwise had cognitive disabilities, and that he considered such cognitive impairments as part of his assessment of the case. After setting forth his educational and work history, Dr. Arroyo testified to his qualifications as an expert in clinical and forensic psychology, specifically in the area of sex offender evaluations. Immediately after qualifying Dr. Arroyo as an expert, the trial court instructed the jury:

"Ladies and Gentlemen, I'm going to allow the witness to testify in part to books, records, articles, and statements that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he relied on to form his opinions. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness."

¶ 10    Dr. Arroyo testified that respondent was currently 35 years old and was housed at a treatment and detention facility (TDF) in Rushville. In 2012, Dr. Arroyo was assigned to evaluate respondent to determine if he was an SVP. During the process, Dr. Arroyo reviewed a number of records, including police reports, prior evaluations, as well as "[a] statement of facts from the State's Attorney's Office, case facts sheets, any police information, rap sheets, any disciplinary information from [the] Department of Corrections and from the treatment detention facility, medical records. Basically anything with his name on it goes in his file." With respect to prior evaluations, Dr. Arroyo testified that he reviewed and relied on SVP evaluation reports that had been completed by Dr. Ray Quackenbush, Dr. Craig Shifrin, and Dr. Smith, primarily to review what comments respondent had previously made about his offenses. Dr. Arroyo testified that, in completing an SVP evaluation, in addition to document review, he also attempted to speak with the individual being evaluated but that the evaluation could still be completed in the absence of an interview through examination of the individual's records. In respondent's case, Dr. Arroyo attempted to interview him on August 2, 2012. Respondent indicated to Dr. Arroyo that he understood the process and that he knew he was being considered an SVP but did not agree to participate in the interview. Dr. Arroyo therefore completed his evaluation through a "thorough records review" and completed a report setting forth his opinions, which was dated August 2, 2012. Dr. Arroyo later updated the report on May 6, 2015, to take into account the change from the DSM-IV-TR to the DSM-5.

¶ 11    Dr. Arroyo testified that his review of respondent's records included a review of his criminal history and that the facts and circumstances of the criminal offenses were relevant to his opinion because they helped to show whether there was a certain pattern of behavior. Dr. Arroyo testified that he did not limit his review to convictions because "I'm still looking at behavior. The same way if I were in private practice and someone was coming to me and I was giving them a diagnosis, I wouldn't rely just on something they have been convicted of. I would be looking at the behavior that they're engaging in."

¶ 12    Dr. Arroyo testified that respondent's criminal history was first documented in 1999, when he was 17 years old, when he was charged with disorderly conduct, simple assault, and criminal trespass. In that case, respondent was arrested after he attempted to remove an eight-year-old girl from school three times, but respondent was not ultimately prosecuted. A month later, respondent was charged with aggravated criminal sexual abuse and unlawful restraint after he grabbed a nine-year-old girl, wrapped his arms around her, and stood on her shoes so she could not move; respondent fled after the girl screamed. Dr. Arroyo testified that in an evaluation completed by Dr. Quackenbush, Dr. Quackenbush reported that respondent had told Dr. Quackenbush that he touched the victim both over and under her clothes. The disposition of that case was unknown.

¶ 13    Dr. Arroyo testified that in 2000, respondent was charged with disorderly conduct, for which he received one year of court supervision, for an incident in which he followed an 8-

year-old and an 11-year-old girl for several blocks, asking them for their names, phone numbers, and addresses; the girls became afraid and ran to their grandmother's house, where respondent followed them to the door. Dr. Arroyo testified that, in looking at these incidents, "I'm looking at the pattern of behavior, and if you're looking at him trying to gain access to a child in the first one, grabbing a child in the second one, and now he's going and following two girls, we are looking at a very similar pattern and we're also looking at an escalation."

¶ 14        Dr. Arroyo testified that, less than a week after leaving court, respondent was again arrested for disorderly conduct concerning the same two girls. Respondent was intentionally placing himself in their presence and verbally contacting them, scaring them to the point that they were afraid to leave their home. Respondent was sentenced to two years of supervision for that offense. During that supervision, in 2001, he was arrested for criminal sexual abuse and ultimately charged with battery in an incident involving a 21-year-old mentally challenged coworker at McDonald's, in which the victim was in the bathroom changing following a shift, and respondent went into the bathroom and looked under the stall. The victim ordered him to leave, but respondent came back into the bathroom, pushed her against the wall, and touched her breasts and vaginal area over her clothing. After a struggle, the victim was left with scratches and redness on her left hand, and the struggle continued until another individual witnessed the event and notified the manager; respondent was fired from his job at McDonald's. Dr. Arroyo testified that this incident showed that, "[a]gain, we're seeing that he is going after victims. This was a 21-year-old victim so it's not exactly where his preference is. We are looking at his preference for 8- to 12-year-old girls, but if we're looking at [respondent] then starting to attack adults, it could be significant that he has increased his pool of victims." Dr. Arroyo testified that the disposition of that case was unknown but that it was still relevant to his opinion because it "counts toward a risk assessment," as did respondent's failure to successfully complete either of his terms of supervision.

¶ 15        Dr. Arroyo testified that, in 2002, respondent was charged with three counts of aggravated criminal sexual abuse, aggravated battery, and unlawful restraint and pleaded guilty to one count of aggravated criminal sexual abuse for which he was sentenced to three years. In that case, the victim was under 13, and respondent attacked the victim from behind after following her, touching her breast and vaginal area. Dr. Arroyo testified that the police report showed that respondent was following the victim and a friend, who stopped to ring a doorbell after noticing respondent. When they stopped to ring the doorbell, respondent ran up, hit the victim in the mouth with a closed fist, and grabbed her breast and vaginal area. The police report indicated that the victim had a swollen lip and bruised elbow, and a witness indicated that the victim was bleeding from her lip. The police report also indicated that respondent informed police that he followed the girls because "he thought one of them was pretty and he wanted to talk to her" and that he became sexually aroused after touching the victim. Dr. Quackenbush's report also indicated that respondent had admitted to the attack to Dr. Quackenbush and had expressed remorse. Dr. Arroyo testified that this demonstrated a further progression in respondent's behavior and "[n]ow we're seeing that he is following victims. He is attacking the victims and if the victims are fighting back, he's also fighting with the victims."

¶ 16        Dr. Arroyo testified that respondent was paroled in August 2003 and that, in September 2004, he was charged with simple assault, for which he received two years' probation; however, since he was still on parole, the offense constituted a violation of his parole, and he was returned to the IDOC until March 2005. In that case, the 11-year-old victim was in front

of her house playing when respondent approached her and attempted to engage her in conversation. The victim told respondent to leave, and respondent dismounted his bicycle and approached her. She became scared and ran inside her home, where the police were called.

¶ 17 Dr. Arroyo testified that, in July 2005, respondent was charged with four counts of aggravated criminal sexual abuse, three counts of criminal sexual abuse, and unlawful restraint and pleaded guilty to one count of aggravated criminal sexual abuse, for which he was sentenced to five years. In that case, the victim was under 13 years old and was returning home from school, when respondent ran to her porch, grabbed her, and told her to come with him, while pulling her arm; respondent also touched the victim's vagina. The victim was screaming the entire time, and a neighbor opened the door and yelled at respondent, who fled. Dr. Arroyo testified that the fact that all of respondent's offenses occurred during the daytime indicated that "basically he sees someone that he is attracted to and goes right after them."

¶ 18 Dr. Arroyo testified that, approximately a week later, prior to his arrest for the July 2005 offense, respondent was arrested for "window peeping." The victim in that case was a 12-year-old girl, and respondent was looking through her window and asked her what time it was. The victim told him the time, then left her room to inform her mother, and respondent left. Approximately half an hour later, he returned, and the mother observed him standing on a crate looking through the window. The mother yelled at respondent, and respondent left. Approximately midnight that same night, the victim's parents noticed a beam of light flashing into the bedrooms. They discovered respondent again standing on crates, attempting to look through the window. When respondent discovered that he had been spotted, he left. The next day, the parents noticed respondent standing in front of their house next to an ice cream truck and called the police. When police arrived, they observed that respondent matched the description of the offender in the July 2005 offense, and respondent was arrested.

¶ 19 Dr. Arroyo testified that, between 1999 and 2005, the only time respondent did not commit an offense was when he was in prison. Dr. Arroyo testified that "[i]t shows that he was unable to comply with supervision even after he had been noticed committing these offenses." Dr. Arroyo also reviewed respondent's disciplinary history while in custody, noting that he was interested in learning whether respondent was able to follow rules while in a secure environment. Dr. Arroyo testified that respondent had received both major and minor tickets, but that some of the minor tickets "included things that would be clinically relevant if you're looking at someone who's interested in young children." For instance, he had a photo of a 12-year-old girl, which he denied having until informed that a shakedown would be performed, after which he admitted to possessing the photo. Additionally, as recently as a few months prior to trial, respondent was discovered in possession of pictures of young girls that respondent had cut from newspaper ads.

¶ 20 Dr. Arroyo testified that he diagnosed respondent with pedophilic disorder, sexually attracted to females. Dr. Arroyo explained the basis for his opinion:

"We are looking at that he has—he's exhibited these sexual behaviors towards children. He's acted on those sexual behaviors and because he's acted on those sexual behaviors, he's been repeatedly arrested. He's been placed on court supervision. He's been incarcerated. He's been placed on community supervision once he's been released and incarcerated again and now he's being considered for civil commitment.

[AAG]: Now, can you see anything additionally about his urges just from looking at the behaviors?

ARROYO: Well, we are looking at the fact that he's been basically identified because of these behaviors. He indicated to one of the evaluators that the thought of going back to prison scared him, but he wanted to talk with the girl anyway. So he kind of considered the consequence, but he still had that urge to go ahead and act out on that behavior.

[AAG]: Now, do these patterns of behavior go into that diagnosis in any way?

ARROYO: We are looking at this behavior that he is showing is constantly targeting girls who are under the age of 13 and he is engaging in sexual behavior with those girls who are under the age of 13."

¶ 21 Dr. Arroyo opined that respondent's diagnosis was a mental disorder affecting his emotional and volitional capacity that predisposed him to commit acts of sexual violence. Dr. Arroyo testified that there was conflicting information in respondent's records suggesting that he could be mentally retarded or have pervasive development delays. However, Dr. Arroyo opined that respondent's behavior was not the result of a developmental delay because, in those cases, "[y]ou'd see it manifesting in different areas and across different types of individuals. I don't see any of that history in his file and what I do see is a very targeted sexual acting out." Dr. Arroyo further testified that even individuals with developmental delays could have pedophilic disorder and that "[r]esearch shows that individuals who are mentally retarded or intellectually disabled, when they are sexually acting out, it's because of true sexual deviance and not what we would consider counterfeit deviance where they're acting out because of low IQ or they don't have the sexual knowledge or they *** can't distinguish right from wrong."

¶ 22 Dr. Arroyo testified that he also performed a risk assessment to predict respondent's likelihood of committing future sexual offenses. He used the Static-99R actuarial model, which gave respondent a score of seven, which was "well above average" with respect to risk. Dr. Arroyo explained that individuals in the "well above average" category are twice as likely to reoffend as individuals in the "above average" category and four times as likely to reoffend as individuals in the "average" category. Dr. Arroyo further explained that "by re-offend, the instrument means a new charge or a new conviction, not just actually engaging in future behavior, but actually engaging in that behavior, the behavior being reported, being charged for it, or being convicted of it." Dr. Arroyo also testified that a score of seven fell in the ninetieth percentile with respect to risk of recidivism.

¶ 23 Dr. Arroyo testified that in performing the risk assessment, he also considered dynamic factors and protective factors, which would not be taken into account in the initial actuarial assessment. In respondent's case, the dynamic risk factors, which would tend to increase the risk of reoffending, included respondent's sexual preference for children, the fact that he had not had any emotionally intimate relationships with adults, respondent's impulsivity or poor problem-solving, and respondent's resistance to rules and supervision. The protective factors, which would tend to decrease the risk of reoffending, typically included age, medical issues, and engaging in treatment and did not apply to respondent. Dr. Arroyo opined that respondent was substantially probable to engage in future acts of sexual violence.

¶ 24 On cross-examination, the defense focused on the various instances throughout respondent's records in which references were made to respondent's intellectual limitations and developmental delays, including Dr. Arroyo's impression that respondent was childlike. The defense also focused on the fact that many of the documents relied on by Dr. Arroyo for respondent's criminal history were police reports or documents generated by the state's

attorney's office. Dr. Arroyo also admitted that the research indicating that developmental delays were not responsible for sexual deviance was not cited in his SVP evaluations.

¶ 25    The State's second witness was Dr. Smith, a licensed clinical psychologist and licensed sex offender evaluator, who was employed by the Department of Human Services (DHS) to conduct sex offender evaluations. After testifying to his educational and work history, Dr. Smith was qualified as an expert in clinical psychology, specifically in the area of SVP evaluations, diagnosis, and risk assessment.

¶ 26    Dr. Smith testified that he was assigned to evaluate respondent in October 2007 in order to determine whether respondent met the criteria to be considered an SVP. Dr. Smith attempted to interview respondent in November 2007, but respondent declined to be interviewed. As Dr. Arroyo had previously done, Dr. Smith testified to the documents he reviewed in the course of his evaluation and testified to respondent's criminal history as set forth in those documents. Dr. Smith testified that, in a December 16, 2007, report, he opined that respondent satisfied the criteria to be considered an SVP and that he reached the same conclusion in a May 11, 2015, updated report. Dr. Smith testified that he diagnosed respondent with pedophilic disorder, sexually attracted to females, nonexclusive type and with other specified personality disorder with antisocial traits. Dr. Smith testified that he observed in his review of the record that respondent could have some sort of cognitive impairment or developmental delay but opined that it would not account for his sexually offending behavior. Dr. Smith further testified that respondent could still be diagnosed with pedophilic disorder and with other specified personality disorder with antisocial traits even if he also had a developmental delay or cognitive impairment.

¶ 27    Dr. Smith opined that respondent's mental disorders affected his emotional or volitional capacity and seriously impacted his ability to control his sexually violent behaviors. Dr. Smith testified that he performed a risk assessment in order to determine whether respondent was predisposed to commit future acts of sexual violence. As Dr. Arroyo had, Dr. Smith applied the Static-99R actuarial instrument, which he determined gave respondent a score of seven, which placed him in the highest of the five risk categories. Dr. Smith also identified five dynamic risk factors, which increased respondent's likelihood of reoffending: sexual interest in children, history of employment instability, general self-regulation problems, a personality disorder, and noncompliance with supervision. Dr. Smith testified that none of the typical protective factors—successful completion of sex offender treatment, a debilitating medical condition, and age—would apply to lower respondent's risk for reoffending. Dr. Smith opined that respondent was substantially probable to commit future acts of sexual violence and further opined that respondent met the criteria to be considered an SVP under the SVP Act.

¶ 28    On cross-examination, the defense again focused on the fact that the information relied on by Dr. Smith as to respondent's criminal record primarily came from police reports and also emphasized that Dr. Smith had not read respondent's master file since his initial evaluation in 2007. The defense also again went through the instances in respondent's records in which mention was made of his possible intellectual disability, and Dr. Smith again testified that any cognitive impairment or developmental delay would not factor into the determination of whether respondent was an SVP. Dr. Smith admitted that he did not include anything in his SVP reports discussing the impact of respondent's intellectual challenges on his opinion.

¶ 29    After Dr. Smith's testimony, the certified copies of respondent's convictions were admitted into evidence and the State rested. The defense filed a motion for a directed verdict, which was

denied. The defense then called respondent to testify on his own behalf. Respondent testified that he attended North Side Learning Center for high school, where he learned to recycle paper. He was also taken to Anixter School, through which he worked at Old Country Buffet washing dishes and at the Salvation Army folding clothes. Respondent was also taught to write and learned math but did not learn to read. Respondent testified that he currently resided at the TDF in Rushville, where he had a job as a dishwasher. Respondent testified that he wanted to inform the jury that he was "very sorry for my crime I did."

¶ 30    On cross-examination, respondent testified that, while he expressed that he was sorry after each of his offenses, he continued to commit them. Respondent also admitted that he had some trouble controlling his behavior but that he had not taken any classes for sex offender treatment. On redirect, respondent testified that he had taken an anger management course.

¶ 31    After respondent's testimony, the defense rested and the parties proceeded to closing arguments. Prior to the State's closing argument, the trial court reminded the jury that closing arguments were not evidence and should not be considered as such. During the State's closing, the State noted that it was required to prove that respondent had a mental disorder and stated that it had done so through the testimony of Dr. Arroyo and Dr. Smith. The State argued:

> "[H]is sexual interest in young female children [is] easy to see because he has repeatedly acted on that interest and that's what causes him to be diagnosed with pedophilic disorder. The personality disorder allows him to disregard the rules of society and disregard the safety and wellbeing of the young girl that he followed and then touches in a sexual fashion.
>
>    Dr. Arroyo and Dr. Smith explained to you that these mental disorder's [sic] are congenital or acquired conditions and that they do impact the respondent's emotional or volitional capacity and predispose him to commit future acts of sexual violence.
>
>    By looking at his offenses, not just the convictions but the actual behavior that underlies his offenses, Dr. Arroyo and Dr. Smith saw a pattern of behavior that supports the diagnoses that they made. And when you look at his offenses, the pattern is easy to see."

¶ 32    The State then began discussing respondent's offenses, and the defense objected. The trial court admonished the jury:

> "Ladies and gentlemen, these are closing arguments. You should base your opinions ultimately on the law that I give you and your recollection of the evidence that was presented."

The defense then made what counsel called a "standing objection" "consistent with the one I made during opening statement," which was overruled, and the State proceeded to discuss respondent's criminal history. After reciting respondent's history, the State concluded:

> "So the doctor's [sic] see a clear pattern of behavior in all of that conduct and they diagnose him with two mental disorders, the pedophilic disorder and the other specified personality disorder with antisocial traits. And it's easy to see the pattern and understand the diagnoses when you look at all of that behavior. The respondent is clearly interested in sexual contact with young girl's [sic] and he doesn't care. He's not stopped by the fact that neither society nor the young girl's [sic] themselves want to be touched by this respondent. You can also see from the repetitive predatory nature of respondent's pattern of behavior that these mental disorders do make him dangerous

because they impact his ability to control his behavior. Clearly, we have proven beyond a reasonable doubt that respondent suffers from a mental disorder as defined by the Sexually Violent Persons Commitment Act."

¶ 33        During its closing, the defense spent a great deal of time discussing the testimony of Dr. Arroyo and Dr. Smith and the bases for their opinions. The defense reminded the jury:

"[T]he other instruction that I want you to remember when you go back into the jury room is this one—and you've heard this a couple of times already during the course of the trial—I am allowing the witness to testify in part to books, records, articles, and statements that have not been admitted into evidence. Their testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he relied upon to form his opinion's [*sic*]. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinion testified to by this witness.

So you've been hearing about these records that the doctor's [*sic*] have been reviewing and that were the basis for their opinion's [*sic*], and you've heard the doctor's [*sic*] talk to you about what was contained in some of those records. That information that was in the records is not evidence in this case. It was not evidence. That information was provided to you as a tool to fulfill your role in deciding on how to judge the opinion's [*sic*] that you heard the doctor's [*sic*] give. That's why you got to hear about the information of the records, to help you make that decision."

¶ 34        The defense then began discussing the bases of the experts' opinions, focusing on the idea that "[u]nreliable processes create unreliable products." When discussing Dr. Arroyo's testimony, the defense noted that Dr. Arroyo had identified a pattern of behavior but that many of the arrests discussed by Dr. Arroyo did not lead to sex crime charges. The defense argued:

"At that point a prosecuting agency didn't believe there was enough evidence to prosecute it as such. That should create some doubts in your mind if that's what the records are saying about whether his theory that you can look at all of these incidents regardless of the charge and say this shows that pattern of offending behavior. That's even more true when you remember that for many of these offenses all he had to work with among the master file records would be a two page police report, a two page general offense case report, maybe a two page case fact sheet that [the] State's Attorney's Office had compiled."

¶ 35        The defense then focused on respondent's mental abilities, pointing out the areas in the records in which respondent had been observed to exhibit intellectual limitations, and arguing that the State's experts had not properly considered respondent's mental abilities in reaching their opinions.

¶ 36        In rebuttal, the State addressed the defense's challenges to the experts' opinions. The State argued:

"[W]ith Dr. Arroyo [defense counsel] says that his pattern of offending behavior it's not sexual in nature. Well, does it have to be? He has been convicted of sexually violent offenses. Two. And when we look at what led up to that, that's where the pattern is. We have someone who initially tries to take young girl's [*sic*] out of school. Now while we don't know specifically why, when we look at his second offense this young girl,

nine years old, he's wrapping his arms around her, he's holding her. He's restraining her so she can't leave so we see a pattern develop, and that pattern extends to other behaviors. Counsel says it's just a hunch. It's not a hunch. It's not even close to a hunch. It's plenty of evidence to show. He's chasing young girl's [*sic*]. The doctor used that for his opinion. He's retraining [*sic*] young girl's [*sic*] and groping them on their chest and vaginal area. He's admitting that he had an erection to these things. He's touching these girl's [*sic*] and he's asking them their personal information, and he's peeping through windows. This is not just a hunch. If it was just one thing or two things or something that we even had to guess about. No, it's not a guess. It's not a hunch. It's a pattern of behavior that he's continued over a period of time. He has a sexual interest and that sexual interest is in young girl's [*sic*]. It's clear. It was clear then and it's clear now. Even in the facility where it's clearly unacceptable he has pictures of young girl's [*sic*] from a catalog."

¶ 37    The State later continued, concerning defense counsel's challenges to the risk assessment:

"Counsel says use your common sense. Yes, please do. Please use your common sense. The respondent has a history of offending. Convictions for offending. So to suggest that the doctor's [*sic*] are inaccurate somehow in assuming that he will continue to re-offend based on his behavior, based on his disorders. It only takes one to use their common sense. Yes, they used the STATIC 99. He received a seven, which is the highest risk category. He used other risk factors, dynamic. Now, you don't have to say how much it will increase to say that it will. To say that there's a connection between them. A sexual preference for children. Yes, there's definitely a connection between his sexual preference for children and his offending. You can see it in his behavior. Do you think we would have done this if he didn't have a sexual interest in children? Certainly he does and the doctor's [*sic*] testified to that.

He has impulsivity. He doesn't think about what he's doing. He just feels. He sees a girl. He thinks she's pretty. He wants to touch her, and so he does. He sees a girl. She's on the stairs. She says go away don't touch me. He drags her down the stairs and he touches her in her vaginal area. It's impulsive. These things may not in isolation seem to be much. But when you couple them with this desire, his urge, for these young girl's [*sic*], you can see that this will effect [*sic*] his re-offending."

¶ 38    After the State's rebuttal, the trial court provided jury instructions to the jury, and the jury retired to deliberate. Once the jury left, the defense made a motion for a mistrial, arguing that the State had used the bases of opinion testimony as substantive evidence in both its opening statement and in closing argument. After hearing arguments on the motion, the trial court denied the motion for a mistrial.

¶ 39    After deliberation, the jury found respondent to be a sexually violent person, and the trial court entered judgment on the verdict on August 9, 2017. After a dispositional hearing, on October 17, 2018, the trial court ordered respondent committed to the custody of DHS for control, care, and treatment in a secure setting until further order of the court. This appeal follows.

¶ 40                                    ANALYSIS

¶ 41    On appeal, respondent claims that the State improperly used the bases of the experts' opinion testimony as substantive evidence during its opening, closing, and rebuttal, which

denied respondent a fair trial. Specifically, respondent claims that the State used the details of respondent's prior offenses for their truth, not to explain the basis of the experts' opinions.

¶ 42 The prosecution is afforded wide latitude in making closing arguments so long as the comments made are based on the evidence or reasonable inferences drawn therefrom. *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42 (citing *People v. Williams*, 192 Ill. 2d 548, 573 (2000)). The prosecution may comment on the credibility of the witnesses and the defense characterizations of the evidence or case, and it may respond in rebuttal to statements made by defense counsel that clearly invite a response. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 30 (citing *People v. Gonzalez*, 388 Ill. App. 3d 566, 590 (2008)). When we are asked to review a challenge to remarks made by the prosecution during closing arguments, the comments must be considered in context of the entire closing arguments made by both parties. *Butler*, 2013 IL App (1st) 113606, ¶ 30 (citing *People v. Wiley*, 165 Ill. 2d 259, 295 (1995)). A reviewing court will not reverse a jury's verdict based upon improper remarks unless the comments were of such magnitude that they resulted in substantial prejudice to the respondent and constituted a material factor in the verdict. *Kelley*, 2012 IL App (1st) 110240, ¶ 42 (citing *People v. Griffin*, 368 Ill. App. 3d 369, 376 (2006)).

¶ 43 In the case at bar, respondent is not challenging Dr. Arroyo's or Dr. Smith's testimony relating the details of respondent's criminal history. It is well-settled that an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is of the type reasonably relied on by experts in the particular field. *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51. Additionally, the expert is permitted to reveal the contents of materials upon which he has reasonably relied in order to explain the basis of his opinion. *Butler*, 2013 IL App (1st) 113606, ¶ 31.

¶ 44 Instead, respondent's focus is on the treatment of this basis of opinion testimony during the State's opening, closing, and rebuttal. Although the expert is permitted to testify to them, the underlying facts or data are admitted for the limited purpose of explaining the basis for the expert's opinion, and the basis of an expert's opinion must not be presented to the jury as substantive evidence of the underlying assertions. *Butler*, 2013 IL App (1st) 113606, ¶ 31.

¶ 45 In support of his argument that the State's references to respondent's criminal history were improper, respondent relies almost entirely on the case of *In re Commitment of Gavin*, 2014 IL App (1st) 122918, in which the prosecutors' arguments were found to constitute reversible error. By contrast, the State claims that the arguments here were more similar to those upheld in *Butler*. In *Butler*, the State discussed the respondent's criminal history in its closing and rebuttal, and the respondent claimed that the State improperly used the basis of the experts' opinion testimony as substantive evidence. *Butler*, 2013 IL App (1st) 113606, ¶ 29. However, after viewing the entirety of the closing and rebuttal, the *Butler* court found that "it is clear that the State argued the facts and circumstances of respondent's history of violent sexual offenses as having been relied upon and completely supporting the opinions of their expert witnesses." *Butler*, 2013 IL App (1st) 113606, ¶ 34. The court further noted that the prosecutors repeatedly prefaced and qualified their remarks as relating solely to their experts' opinions. *Butler*, 2013 IL App (1st) 113606, ¶ 34.

¶ 46 In *Gavin*, however, the court reached the opposite conclusion, finding *Butler* distinguishable. *Gavin*, 2014 IL App (1st) 122918, ¶ 70. The *Gavin* court noted that the prosecution in *Butler* "framed the facts underlying the respondent's past convictions as a ' "deviant pattern" ' of behavior the experts relied on in reaching their diagnosis." *Gavin*, 2014

IL App (1st) 122918, ¶ 70 (quoting *Butler*, 2013 IL App (1st) 113606, ¶ 33). By contrast, the *Gavin* court found that the prosecutors in the case before it "repeatedly referred to the underlying facts as something other than the basis for the experts' opinions." *Gavin*, 2014 IL App (1st) 122918, ¶ 73. The court pointed to comments by the prosecutors that the experts would " 'tell' or 'show' the jury about [the respondent's] past sex crimes" (*Gavin*, 2014 IL App (1st) 122918, ¶ 73), as well as referring to the hearsay statements as " 'facts' and 'evidence' " (*Gavin*, 2014 IL App (1st) 122918, ¶ 73). The court also noted that the State argued the facts underlying the respondent's convictions as a narrative:

> "It occasionally prefaced its recitation of these details by noting that these facts were what the experts 'relied on' to form their opinions. But, unlike in *Butler*, the prosecutors did not mention how the experts relied on these facts to diagnose or assess [the respondent]. This narration of the facts underlying [the respondent's] crimes, which at times reads as if [the respondent] was on trial for rape, was error. It misdirected the focus of the case, disconnecting the underlying facts and the experts' use of them. In other words, as a narrative, the underlying facts took on the cloak of evidence, thereby leading the jury to consider these facts independent of the expert testimony." *Gavin*, 2014 IL App (1st) 122918, ¶ 74.

¶ 47    In the case at bar, we find the statements in the State's arguments to be more similar to those in *Butler* than those in *Gavin*. In both its opening and its closing, the State focused on the fact that the experts had relied on the existence of a pattern of behavior and recited the details of respondent's prior offenses in the context of describing that pattern. In its opening, the State made the connection between the experts' opinions and the underlying offenses frequently, prefacing the discussion of each set of offenses with a statement about how the experts used the offenses as adding to the establishment of an emerging pattern that resulted in respondent's diagnosis. In its closing, the State took a slightly different approach, beginning its closing by stating that it would be discussing the behaviors that the experts determined formed a pattern before detailing the offenses. While the *Gavin* court found the use of a narrative problematic in the case before it, here, examining the comments in the context of the State's closing as a whole, it is clear that the State's remarks were quite different from those in *Gavin*. In no way did the State's comments in the instant case make it appear as though respondent was on trial for his past offenses, as was the case in *Gavin*. Here, the State emphasized that it was the pattern of offenses that led the experts to their diagnoses, and its closing merely served to illustrate that pattern.[3]

¶ 48    With respect to the State's rebuttal, the main focus of the rebuttal was responding to the defense's arguments concerning the experts' credibility. The defense spent much of its closing

---

[3]We note that, in his reply brief, respondent distinguishes *Butler* in part by citing our supreme court's recent decision in *People v. Murray*, 2019 IL 123289. While *Murray* was decided after respondent had filed his initial brief on appeal, respondent did not file a motion for leave to cite the case as additional authority, thereby depriving the State of the ability to address respondent's argument. Moreover, *Murray* involved an expert who testified as to the types of information underlying his opinion without testifying as to the connection between that information and his opinion. *Murray*, 2019 IL 123289, ¶ 31. It did not address a prosecutor's argument about the expert's testimony. We also note that, while respondent does not raise any issues concerning the contents of Dr. Arroyo's and Dr. Smith's testimony, they both extensively testified that the pattern of respondent's behavior documented in the records they reviewed led directly to their diagnoses.

- 14 -

arguing that the experts were relying on limited information and that a large part of the information detailed in the reports relied on by the experts did not consist of sex offenses. In response, the State again turned its focus to the fact that the reports identified a pattern of certain behavior, which was the basis for the experts' diagnoses. We can find no error in the State's arguments.

¶ 49   Furthermore, to the extent that any of the State's comments were problematic, the trial court verbally warned the jury four times:

> "Ladies and Gentlemen, I'm going to allow the witness to testify in part to books, records, articles, and statements that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he relied on to form his opinions. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness."

This instruction was also included in the jury instructions given to the jury at the end of the trial. "There is a strong presumption that jurors follow the instructions given by the court." *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 605 (2007). We find nothing to indicate that the presumption was rebutted in the instant case. See *Kelley*, 2012 IL App (1st) 110240, ¶ 46 (finding limiting instruction alleviated any risk that State's comments were viewed as substantive evidence); *Butler*, 2013 IL App (1st) 113606, ¶ 38 (same). But see *Gavin*, 2014 IL App (1st) 122918, ¶¶ 77-78 (finding State's comments so egregious that presumption was rebutted).

¶ 50   We are also unpersuaded by respondent's contention that the State improperly vouched for the credibility of its experts in its rebuttal by remarking, "Do you think we would have done this if he didn't have a sexual interest in children?" Respondent raises this argument for the first time on appeal, and we therefore review it under the plain-error doctrine. See *Gavin*, 2014 IL App (1st) 122918, ¶¶ 52-55 (noting that the criminal plain-error doctrine is appropriate for proceedings arising under the SVP Act). "The criminal plain error doctrine allows us to reach a forfeited error that affects substantial rights where: (i) the evidence is so closely balanced, the jury's guilty verdict might have resulted from the error and not the evidence; or (ii) the error is so serious the defendant was denied a substantial right and, thus, a fair trial." *Gavin*, 2014 IL App (1st) 122918, ¶ 56 (citing *People v. Ware*, 2014 IL App (1st) 120485, ¶ 14). " 'Our first step in plain error review is to determine whether any error occurred at all.' " *Gavin*, 2014 IL App (1st) 122918, ¶ 56 (quoting *People v. Sullivan*, 2014 IL App (3d) 120312, ¶ 26).

¶ 51   In the case at bar, even if the State's comment was improper, it would not rise to the level of plain error. The evidence was not closely balanced: the State presented the testimony of two experts who both concluded that respondent met the criteria of being an SVP. The main defense was that the experts did not properly account for respondent's intellectual disability in making their diagnoses, but both experts testified that intellectual disabilities or developmental delays would not preclude an individual from being an SVP. Additionally, respondent has not identified any cases in which a similar comment was found to fall under the second prong of the plain-error doctrine. To rise to the level of second-prong plain error, the error must be one affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 106. At most, the State's comment was a passing reference in its rebuttal—it was not a focus of its argument, nor was it

- 15 -

repeated—and we cannot find that it affected the framework of the SVP proceedings. Accordingly, we cannot find that this comment rises to the level of plain error under either prong.

¶ 52                                    CONCLUSION

¶ 53      For the reasons set forth above, we cannot find that the State used the basis of its experts' testimony as substantive evidence in its opening, closing, or rebuttal and accordingly did not deprive respondent of a fair trial.

¶ 54      Affirmed.