2025 IL App (1st) 232214-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
September 22, 2025

Nos. 1-23-2214 and 1-24-1360 (cons.)

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | |
|---|---|
| | ) Appeal from the |
| | ) Circuit Court of |
| *In re* COMMITMENT OF ANDRE WINSTON | ) Cook County |
| | ) |
| | ) No. 12 CR 80014 |
| (The People of the State of Illinois, Petitioner-Appellee, v. | ) |
| Andre Winston, Respondent-Appellant). | ) The Honorable |
| | ) James B. Novy, |
| | ) Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:*   The appellate court affirms the trial court's judgment entered upon a jury trial finding respondent to be a sexually violent person and the trial court's order committing him to institutional care in a secure facility.

¶ 2    Respondent Andre Winston appeals from the judgment of the trial court entered upon a jury's determination that he was a sexually violent person in proceedings under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2022)). Respondent argues that the evidence presented by the State at trial was insufficient to prove beyond a reasonable doubt that he was a sexually violent person. He also raises multiple arguments that errors occurred at his trial

involving evidentiary rulings, closing arguments, and jury instructions. Finally, he raises several challenges arising out of the trial court's order committing him to institutional care in a secure facility, which occurred after the trial court had initially found conditional release to be appropriate. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Pretrial Background

¶ 5        The record before this court reveals that in 1988, respondent was found guilty in a bench trial in Cook County case number 87-CR-2389 of two counts of aggravated criminal sexual assault, one count of armed robbery, and one count of armed violence stemming from an incident that occurred on January 26, 1987, when respondent was 20 years old. Respondent was sentenced to 37 years and 6 months in the Illinois Department of Corrections on that conviction.

¶ 6        On December 17, 2012, shortly before respondent was scheduled to be released from prison, the State filed a petition seeking respondent's involuntary commitment under the Sexually Violent Persons Commitment Act.

¶ 7        In February 2013, the trial court conducted a probable cause hearing on the petition and initially ruled that the State had failed to show probable cause that respondent was a sexually violent person. This initial ruling was based in part on the trial court's finding that Ashley Paluska, Psy.D., the licensed clinical psychologist who testified for the State at the probable cause hearing, had used "unreliable" evidence in reaching the opinion that respondent met the diagnostic criteria for the mental disorder of paraphilia not otherwise specified with sexual attraction to nonconsenting females (hereinafter "paraphilia NOS nonconsent"). Generally speaking, that diagnosis required a showing of recurrent and intense sexually arousing fantasies, urges, or behavior involving nonconsenting persons over a period of at least six months. The evidence that

the trial court described as "unreliable" included three offenses for which respondent had been charged as a juvenile, of which the records had been destroyed by 2013. Thus, Dr. Paluska knew minimal factual details about these three juvenile cases in reaching the opinion that respondent had engaged in behavior toward nonconsenting persons over a period of at least six months.

¶ 8        Respondent's first juvenile case involved an incident in 1981, when respondent was 15 years old. He was charged with aggravated criminal sexual abuse, aggravated burglary, burglary, battery, sexual relations within family, and two counts of miscellaneous delinquency. He was found delinquent, although it is unknown as to which charges, and placed on probation.

¶ 9        Respondent's second juvenile case involved an incident in 1982, when he was 16 years old, for which he was charged with battery, disorderly conduct, and sexual relations within family. These charges were dismissed with leave to reinstate.

¶ 10       Respondent's third juvenile case involved an incident in 1983, when he was 16 years old, for which he was charged with home invasion, aggravated battery, and burglary. Respondent pled guilty to the home invasion charge and was sentenced to six years in the Illinois Department of Corrections (IDOC). No record indicates that there was any sexual component to this 1983 offense except for a "statement of facts" that was prepared by the office of the Cook County State's Attorney as part of respondent's later case in 1987. That document, which is not contained in the record on appeal, apparently suggests that respondent had a motive to commit sexual assault as part of this 1983 incident but was interrupted before any offense of a sexual nature occurred.

¶ 11       As indicated, the trial court initially found following a February 2013 hearing that the State had failed to show probable cause that respondent was a sexually violent person. The trial court found that Dr. Paluska's lack of knowledge of any factual detail about respondent's three juvenile adjudications rendered them unreliable as a basis for her diagnosing him with the mental disorder

of paraphilia NOS nonconsent. However, on March 22, 2013, the trial court granted a motion by the State to reconsider its ruling. In doing so, the trial court reiterated its finding that the lack of factual information about respondent's three juvenile cases rendered them unreliable as bases for Dr. Paluska's diagnosis. But the trial court found from its review of the transcript that it had initially misunderstood Dr. Paluska's testimony that her diagnosis of paraphilia NOS nonconsent did not rely entirely on the 1987 offense plus the three juvenile adjudications; instead, it also relied on 10 incidents of sexual misconduct for which respondent had been issued disciplinary tickets by IDOC between 1990 and 2012. The trial court found that these 10 incidents, which generally fit a pattern of respondent intentionally exposing himself and masturbating when female correctional officers were present, had been properly relied upon by Dr. Paluska in diagnosing respondent with the mental disorder of paraphilia NOS nonconsent. The trial court thus found upon reconsideration that the State had shown probable cause that respondent was a sexually violent person.

¶ 12                                B. Trial

¶ 13        Respondent's case ultimately proceeded to a two-day jury trial beginning March 8, 2023. Prior to trial, respondent filed a motion *in limine* to preclude the State's witnesses from disclosing any contents of the "statement of facts" prepared by the State's Attorney's office as part of the 1987 case on the grounds that the statements in it were unreliable. A second motion *in limine* sought to preclude testimony about the details of his disciplinary infractions while incarcerated on the same grounds that they were unreliable. The trial court denied both motions.

¶ 14        Two witnesses testified at respondent's trial. Both were licensed clinical psychologists who testified as expert witnesses on behalf of the State. The first was Melissa Weldon-Padera, Psy.D., who specializes in sex-offender evaluation for Wexford Health Sources, which is a contractor hired by IDOC. The second was Nicole Hernandez, Ph.D., who also specializes in sex-offender

evaluation and is employed by the Illinois Department of Human Services (DHS)

¶ 15                                            *1. Melissa Weldon-Padera, Psy.D.*

¶ 16                                            *a. Direct Examination*

¶ 17        Dr. Weldon-Padera testified that she had become involved in respondent's case in 2014 after the previous evaluator had resigned. On March 3, 2014, she met with the respondent and offered to interview him as part of her evaluation; however, he declined an interview. She thus proceeded by reviewing the available information including records from respondent's criminal cases, records from his time at IDOC and his detainment at the DHS treatment and detention facility, his medical records, and any prior psychological records. As of the time of trial, she had reviewed updated records through October 2022. She testified that these were the kinds of records reasonably relied upon by experts in her field when conducting such evaluations. The trial court instructed the jury that Dr. Weldon-Padera was being permitted to testify to these materials for the limited purpose of informing the jury what she had relied upon to reach her opinions, that it was not evidence in the case and could not be considered by the jury as such, and it could only be considered on the question of the weight to be given to the testimony. See Ill. Pattern Jury Instructions, Civil, No. 2.04 (hereinafter "IPI Civil 2.04").

¶ 18        Dr. Weldon-Padera testified that it was her opinion to a reasonable degree of psychological certainty that respondent met the statutory criteria to be found a sexually violent person and referred for civil commitment. He had been convicted of a sexually violent offense, that being his conviction for aggravated criminal sexual assault in case number 87-CR-2389. It was also her opinion to a reasonable degree of psychological certainty that he suffers from five mental disorders: (1) other specified paraphilic disorder, sexually aroused by nonconsenting females in a controlled environment (OSPD nonconsent); (2) exhibitionistic disorder, sexually aroused by

exposing genitals to mature individuals; (3) alcohol abuse disorder, moderate, in a controlled environment; (4) cannabis use disorder, moderate, in a controlled environment; and (5) antisocial personality disorder (ASPD). In diagnosing respondent, she relied upon the fifth edition of the Diagnostic and Statistic Manual (hereinafter "DSM-5"), which she described as the authoritative guidebook used by all mental health professionals to diagnose mental disorders. She testified that each of these five mental disorders is a congenital or acquired condition that affects emotional or volitional capacity and that predisposes respondent to engage in acts of sexual violence.

¶ 19     As to the first mental disorder of OSPD nonconsent, she explained that "paraphilia" is any intense and persistent sexual arousal or interest in something abnormal, including nonconsenting partners. Paraphilia becomes a disorder when the person acts on it or when it causes them distress or impairment or harm to somebody else. In coming to that diagnosis, she relied upon respondent's criminal history, including his three juvenile cases. See *supra* ¶¶ 8-10. As to the 1981 and 1982 cases, she testified to the charges against him and the nature of the disposition, but she testified that she had no police reports or other records to review given the length of time that had passed. As to the 1983 case involving home invasion, she testified over respondent's objection that her review of the statement of facts from his subsequent case in 1987 indicated that respondent's motivation for this 1983 home invasion was sexual "in that he sexually offended a young woman but was surprised by family members before he could achieve penetration."

¶ 20     She also testified that she reviewed police reports and the statement of facts from respondent's 1987 case that had resulted in the conviction for aggravated criminal sexual assault. She explained that the records indicated respondent had approached a woman in a parked car and forced her at knifepoint to perform acts of oral and vaginal sex on him. He then restrained the victim and drove the victim's car to the homes of two of his girlfriends, where he again forced her

at knifepoint to perform acts of affection toward him. He finally drove the victim to a different location and again forced oral and vaginal sex upon her, after which time the victim escaped by jumping from the moving car. Dr. Weldon-Padera testified that she had also relied upon statements that respondent had made about this incident to another evaluator who had interviewed him, in which respondent acknowledged being sexually satisfied by the assault. This signified to Dr. Weldon-Padera that respondent experiences sexual arousal to experiences of violence with nonconsenting individuals.

¶ 21    In addition to his criminal history, Dr. Weldon-Padera also considered respondent's behavior while in IDOC custody in diagnosing him with OSPD nonconsent. Over objection, she testified to two specific incidents for which he had been given disciplinary tickets relevant to this diagnosis. One occurred when he ran his hand on the thigh of a teacher two times after she had told him to stop. The second occurred when he placed his hand on the buttocks of a medical technician after she had told him to get out of her room. These two incidents showed that respondent is unable to control his urges and behavior even in a highly controlled environment. These incidents, along with his juvenile and criminal history, show that respondent has a desire for engaging in sexual behavior with unwilling females and obtains gratification of this paraphilic interest in a way that causes harm or risk of harm to others.

¶ 22    She testified that respondent continues to suffer from OSPD nonconsent because paraphilic disorders are lifelong conditions that do not go away without treatment. She testified that this disorder predisposes him to engage in acts of sexual violence because he has not shown that he can control his urges, impulses or behavior, even in the controlled environment of the detention center, and he has not engaged in sex offender treatment to learn ways to manage or reduce them.

¶ 23    As to respondent's second mental disorder, exhibitionistic disorder, Dr. Weldon-Padera

explained that he meets the criteria for this disorder because he has a 30-year history within IDOC of exposing his genitals to nonconsenting and unwilling females. Over objection, she explained and provided examples that, in addition to the two above-described incidents for which respondent had received disciplinary tickets, he had nine additional tickets for exposing his genitals to female staff or for masturbating in the presence of female staff. She explained that his most recent write-up for sexual misconduct as of the time of trial had been in October 2022. She testified that his exhibitionistic disorder predisposes him to commit acts of sexual violence because it indicates that he has not shown an ability to control himself with regard to his impulses and behaviors, he has continued to act on them, and he has not undergone treatment to learn to control them.

¶ 24      As to respondent's third mental disorder, ASPD, Dr. Weldon-Padera explained that this is a pervasive pattern of disregarding and violating others' rights since age 15. While the diagnosis requires him to meet only three criteria, respondent meets seven criteria. For example, he fails to conform to social norms, as shown by his criminal history and inability to follow rules while incarcerated or detained. He has shown a reckless disregard of others by his pattern of physical and sexual assaults. He has also exhibited no remorse or concern for his criminal or sex-offense victims. Dr. Weldon-Padera explained that respondent's ASPD predisposes him to engage in acts of sexual violence, as antisocial tendencies are linked to higher sexual recidivism rates, and it is easier for a person to sexually reoffend when that person does not care about following rules or respecting others' rights.

¶ 25      As to respondents' fourth and fifth mental disorders, alcohol and cannabis use disorders, Dr. Weldon-Padera testified that his use of these substances while he had been in the community had met the diagnostic criteria, and he had also admitted to being intoxicated or high on cannabis at the time of some of his arrests. These disorders do not go into remission until it is shown that he

can be in the community for a period of time without using the substances. These disorders predispose him to engage in acts of sexual violence, because research has shown that substance use increases sexual recidivism risk due to impaired judgment, distorted thinking, and increased impulsivity, even in a person who has learned from treatment.

¶ 26　　Dr. Weldon-Padera next testified to a reasonable degree of psychological certainty that respondent is substantially probable to commit future acts of sexual violence if there is no appropriate custody or treatment for him. Her opinion is based in part on risk assessments that she performed, along with her consideration of "dynamic" risk factors and protective factors. She used two actuarial tests that measure "static" risk factors, meaning historic factors that do not change except for age. The first actuarial test she used was the Static-99R, on which respondent's score of 7 put him in the highest category of risk to sexually reoffend. His score of 7 is in the top 97.2% of the sample, meaning he is 5.25 times more likely to be sexually reconvicted than the average sex offender. His absolute risk to reoffend associated with this score is 30.7% over 5 years, 42% over 10 years, and 51.1% over 20 years. The second test was the Static-2002R, on which respondent's score of 7 also placed him in the highest risk category to sexually reoffend. His score was in the top 99.3% of the sample and equates to him having a sexual recidivism rate that is 3.6 times higher than the average sex offender. His absolute risk to reoffend associated with the score of 7 on this test is 26.8% over 5 years and 45.7% over 20 years.

¶ 27　　To measure respondent's dynamic risk factors, which she described as psychological variables that have been shown in research to be "related to" sexual recidivism but that can change through treatment, she used an assessment test known as Stable-2007. This assessment takes into account factors that are associated with sex offending but that can be progressively changed through intervention and treatment. Among the factors relevant in respondent's case are that he

has some support from family members and his ex-wife, but it is unknown what level of kind or support he receives. Another factor is that because he has been incarcerated or detained for most of his life, he has never shown a capacity to be involved in a long-term, stable, marriage-type relationship. While he did marry a woman during his incarceration, he also has a documented history of domestic abuse toward her, including physically assaulting her during two visits. His criminal history is reflective of a person who is indifferent to the overall well-being and rights of others, and he has not participated in sex-offender treatment to demonstrate a level of understanding of victim empathy and that his conduct causes harm. His criminal record and disciplinary infractions show that he acts impulsively without regard to the negative consequences to himself or others.

¶ 28    Finally, Dr. Weldon-Padera considered whether any protective factors existed that reduced respondent's risk to reoffend. Although recidivism risk normally decreases as a person ages, she testified that in this case it is clear that respondent has not aged out of it by age 56. He has also not engaged in the core sex-offender treatment groups at his DHS treatment facility, and he has been removed from other groups due to engaging in inappropriate sexual behaviors while in them.

¶ 29                                  *b. Cross-Examination*

¶ 30    On cross-examination, Dr. Weldon-Padera acknowledged that respondent had no obligation to participate in an interview with her as part of the evaluation process. She acknowledged that she had no details about his 1981 or 1982 juvenile cases, and she does not know whether respondent was adjudicated delinquent on all charges against him in the 1981 case. The charge of sexual relations within family filed in these cases is not considered a sexually violent offense. As to his 1983 case, she acknowledged that the only document she had that made reference to a sexual motive was the statement of facts prepared by the State's Attorney's office in the 1987 case, and

that consisted of only one or two sentences that reference a sexual motivation. As to his 1987 case, she agreed that she had minimal law enforcement information about that case and had not reviewed any trial transcripts. She also acknowledged that the incident for which respondent had received a disciplinary ticket while in IDOC for touching a teacher's thigh had occurred in 1990, and the incident involving his touching of a medical technician's buttocks had occurred in 1992.

¶ 31    She acknowledged that the DSM-5 includes a cautionary statement that when its categories, criteria, and descriptions are employed for forensic purposes, there is a risk that diagnostic information will be misused or misunderstood; and having a DSM-5 diagnosis does not necessarily mean that impulses or behavior cannot be controlled. She acknowledged that the "nonconsenting" qualifier of her diagnosis of OSPD nonconsent is not specifically listed in DSM-5, and attempts to make sexual arousal to nonconsenting partners a standalone diagnosis have been rejected. As such, the DSM-5 includes no standardized diagnostic criteria for it. She was questioned as to her lack of knowledge of the factual details of respondent's three juvenile cases on her opinion that he had shown a "pattern" since adolescence of sexual behavior with unwilling females. She could not point to any evidence that he had experienced arousal during any of the incidents cited other than the 1987 offense. She also agreed that the 1987 offense had been the last incident of sexually violent behavior by respondent. There had been no documented evidence of him committing a hands-on offense to another person since 1992.

¶ 32    She acknowledged that the recidivism data associated with the scores on the Static-99R comes from a "high-risk high-needs" sample group, not from the "routine" sample group. The high-risk high-needs sample groups studied over 5-year and 10-year periods were significantly smaller than the routine sample groups. The demographics studied in both sample groups included all ages, and there is a possibility that the risk levels of older sex offenders are inflated. As to the

Static-2002R, she acknowledged that assigning respondent a score of 7 required her to use his juvenile offenses to determine that he had multiple sentencing occasions for sexual offenses prior to the 1987 offense; and she was again questioned concerning her lack of knowledge that those juvenile cases involved sexual-offense adjudications. She also acknowledged that for both tests, the recidivism data includes reoffenders who commit noncontact offenses such as exposure or breaking into a home to steal underwear. Such noncontact offenses are not considered sexually violent offenses.

¶ 33        She was also questioned about her evaluation of dynamic risk factors through the Stable-2007 test. She acknowledged that the coding manual for this test states that a comprehensive assessment should include an in-person interview, yet that was not offered to respondent in 2021 at the time when she first employed that test. It also states that a comprehensive assessment should include review of records and collateral information, and this would include interviews with the offender's support network. She acknowledged that she had not reached out to respondent's ex-wife or other family members for purpose of evaluating the factors relevant to the Stable-2007 test. There was no redirect examination by the State of Dr. Weldon-Padera.

¶ 34                                *2. Nicole Hernandez, Ph.D.*

¶ 35                                *a. Direct Examination*

¶ 36        Dr. Nicole Hernandez was the second expert witness to testify for the State. She likewise conducted an evaluation of respondent based upon a review of records including his IDOC master file, any available court documents and police reports, prior examinations of him, and his records from the DHS treatment and detention facility, which include his treatment plans, progress notes, disciplinary records, and mental health and medical records. She testified that these were the kinds of records reasonably relied upon by experts in her field when conducting these types of

evaluations, at which point the trial court instructed the jury pursuant to IPI Civil 2.04. Dr. Hernandez testified that she also conducted an 85-minute interview with respondent in July 2022.

¶ 37   In her testimony Dr. Hernandez expressed an opinion to a reasonable degree of psychological certainty that respondent meets the criteria to be found a sexually violent person. He has been convicted of a sexually violent offense, and he has mental disorders that make it substantially probable that he will engage in future acts of sexual violence.

¶ 38   As to his mental disorders, Dr. Hernandez testified that she diagnosed him with three: (1) OSPD nonconsent, (2) exhibitionistic disorder in a controlled environment, and (3) ASPD. She also used DSM-5 in making her diagnoses.

¶ 39   Dr. Hernandez testified that respondent's OSPD nonconsent and exhibitionistic disorders act in combination in his case. The available records show that he began at a young age engaging in sexually deviant behaviors. These include two arrests at ages 15 and 16 for sexually problematic behavior with family members, plus a conviction for aggravated sexual assault at age 20 for abducting a female and sexually assaulting her multiple times in multiple locations. Since respondent has been in confinement, he has been unable to engage in behavior of the same nature, and therefore his behavior has evolved into exposing behavior with the hope of obtaining a reaction from the nonconsenting female corrections staff and therapy aides. At IDOC he had 11 disciplinary reports over a 22-year period of exposing himself, masturbating, or touching female staff inappropriately. At the DHS treatment and detention facility, he has had an additional 25 reports, most of which involve exposing himself. The most recent incident prior to trial was in October 2022, when he was masturbating in a highly public location within the facility and also exposed himself during a group therapy discussion. He has also had three separate incidents in recreational group therapy sessions of touching himself inappropriately in the group room. He has further

acknowledged that he is aroused by exposing himself to and getting a reaction from females, that he cannot control his urges, and that it is his way of coping.

¶ 40    Dr. Hernandez testified that ASPD applies to respondent because he has engaged in behaviors showing a complete disregard for others throughout his life: skipping school; selling drugs; affiliating with gangs; and being arrested at age 15 and first incarcerated at age 16. He has continued to consistently engage in such behaviors since the time of his institutionalization, having received 132 disciplinary reports in IDOC and 49 disciplinary reports at the DHS treatment and detention facility.

¶ 41    Concerning all three diagnoses, Dr. Hernandez testified that respondent's strong sexual urges and lack of concern for others cause him to engage in these behaviors repeatedly despite sanctions. His mental disorders make him substantially probable to commit future acts of sexual violence because he admits that he cannot control himself. Thus, in an environment with few restrictions, he would be capable of reengaging in his past behavior such as abducting women at knifepoint or committing rape. Dr. Hernandez finds it significant that respondent has received double the number of sexual rule violation reports since moving to the less-restrictive setting of the DHS facility than he did during his incarceration at IDOC.

¶ 42    Dr. Hernandez also conducted a risk assessment as to respondent by using actuarial measures, and she also considered dynamic risk factors and protective factors. On the Static-99R test, she scored respondent a 7, which placed him at the "highest of high-risk categories" and indicated that he was 5.25 times more likely to sexually reoffend than the typical sex offender. On the Static-2002R, she scored respondent a 6, which placed him in the second highest risk category and indicated that he was 2.63 times more likely to sexually reoffend than a typical sex offender.

¶ 43    Dr. Hernandez also identified various dynamic risk factors affecting respondent's likelihood

to sexually reoffend. She found that he has a deviant sexual interest or preference, that being an arousal to nonconsenting persons; sexual preoccupation, as shown by his doubling of reported incidents of sexually inappropriate behavior within the less restrictive DHS facility; and an acknowledgement that he uses these behaviors to cope with his situation. He justifies his offenses in his mind, particularly by stating that his exposing and masturbating behaviors are not as bad as the offenses he committed when he was in the community. He exhibits grievance hostility, by filing an excessive number of grievances within the DHS treatment and detention facility and by blaming the female staff members for setting him up to masturbate in front of them. He has no history of forming long-term, emotionally intimate relationships, and even though he was married, he twice assaulted his wife during her visits to IDOC. He has shown resistance to and noncompliance with rules.

¶ 44      Finally, Dr. Hernandez considered respondent's protective factors of completing sex offender treatment, any debilitating medical conditions, and his age. She does not find respondent's age of 56 to be a protective factor, because he has continued through the present to engage in sexual acting out and antisocial behaviors. He does not have any medical conditions that are debilitating in a way that he cannot reoffend. And he has only briefly attended relapse prevention treatment designed to help him take responsibility for his offending behavior, figure out why it occurs, and find ways to prevent it from occurring in the future. He had also been removed from several groups for exposing himself, and at the time of trial he had not received any treatment in four years.

¶ 45                                        *b. Cross-Examination*

¶ 46      On cross-examination, Dr. Hernandez acknowledged that she had previously worked as a treatment provider at the DHS treatment and detention facility, during which time she had provided treatment to respondent between September and December 2015. During that treatment,

- 15 -

respondent had complained about her for pressuring him to discuss a ticket for masturbation. She was on his treatment team and participated in discussing a treatment plan with him. She also provided treatment to him in a skills group between January and June 2016. She disagreed that she had a conflict of interest in evaluating respondent, stating that it had been eight years since her treatment of him.

¶ 47    Dr. Hernandez acknowledged that she combined the diagnoses of OSPD nonconsent and exhibitionistic disorder on direct examination because there is overlap between them, although they are separate disorders. She agreed that 1987 was the last time respondent had engaged in a sexually violent offense but added that he was continuing to engage in offense-adjacent behaviors "because he cannot abduct a woman in the facility at knifepoint." She acknowledged that he had worked in the dietary division of the prison and thus had been in the presence of knives without incident. She did not know whether other individuals within IDOC had engaged in sexually violent offenses. She agreed that exposing genitals is not considered a sexually violent offense if it occurs in the community, but she added that "it's the motivation of that nonconsent and repetitively engaging the same people when they're telling him to stop, that is in the realm of that sexually violent offense." By that, she meant his conduct within the controlled environment was in the same pattern of "targeting a victim, they are saying no, he's getting aroused to it, he's getting erect to it, and he's exposing and masturbating." She agreed that exposing and masturbating were not sexually violent offenses in themselves, nor is touching someone on the thigh. She stated that there were instances in which touching another individual on the buttocks for the purpose of sexual arousal could be considered a sexually violent offense under the law, but the offense of criminal sexual abuse is not a sexually violent offense.

¶ 48    She testified that exhibitionistic disorder on its own cannot predispose someone to engage in

acts of sexual violence, but it was predisposing respondent to engage in acts of sexual violence in conjunction with his OSPD nonconsent and his ASPD. The ASPD likewise did not predispose him to engage in sexual violence on its own, but it did in conjunction with the OSPD nonconsent. She testified that in diagnosing him with OSPD nonconsent, she was not relying on the 1981 juvenile incident as necessarily having occurred; instead, it was part of his pattern of accusations of inappropriate sexual behavior, which "don't come out of nowhere." She stated that the offense of sexual relations within family was nonconsensual by nature. She testified that she had not relied on the 1983 incident of home invasion for the diagnosis of OSPD nonconsent or exhibitionistic disorder, but she relied on it only for the diagnosis of ASPD. She agreed that a mental disorder as defined by DSM-5 is not necessarily the same thing as a mental disorder under the Sexually Violent Persons Commitment Act.

¶ 49        As for her risk assessment, Dr. Hernandez agreed that neither of the two actuarial tests she used was limited to assessing the risk of sexually violent offenses; they assessed the risk to commit any form of sexual offense, which could include nonviolent offenses such as stealing underwear or exposing behavior. She testified that she assigned respondent a score of 6 on the Static-2002R because she did not count his juvenile cases as "prior sentencing occasions" for purposes of that test. She did that to be conservative because she did not have the records. She agreed that the two tests do not indicate whether someone's risk to reoffend is caused by a mental disorder.

¶ 50        She was asked about her assessment of respondent's dynamic risk factors, and she disagreed that it was "double-dipping" to score him points for prior sex offenses on the static tests and also use them in her evaluation of the dynamic risk factors. Using them in this fashion does not increase his score, but an offender with multiple dynamic risk variables is at a higher risk to reoffend. She agreed that each of the dynamic risk factors had been part of an analysis in which they found that

the factors had small correlations upon sexual recidivism, although they were not limited to looking only at violent offenses. Thus Dr. Hernandez does not know whether any of the dynamic risk factors had any relationship to sexually violent recidivism or whether any of the actuarial instruments are predictive of sexual violence according to the Sexually Violent Persons Commitment Act. There was no redirect examination by the State of Dr. Hernandez.

¶ 51                                                  *3. Closing Arguments*

¶ 52        Following the conclusion of the evidence, the case proceeded to closing arguments. Pertinent to this appeal, the prosecutor made several references in closing and rebuttal to the facts of respondent's juvenile and criminal cases. For example, she stated that respondent had been "convicted of a home invasion at age 16 *** that had some sexual motivation to it." She also stated, "And while on parole, at age 20, he committed the act of aggravated criminal sexual assault. That's where he abducted the woman at knife point, drove her around, went to two separate locations where he sexually assaulted her in two different manners." She also referenced respondent's disciplinary tickets, including by stating that respondent "at age 56, had a sexual misconduct at the treatment and detention facility not six months from the day of his trial." And two references were made in rebuttal closing that respondent could "walk out the door." Those statements are set forth in greater detail in our analysis below.

¶ 53                                                  *4. Jury Instructions*

¶ 54        Several rejected jury instructions are also pertinent to this appeal. Respondent tendered a proposed nonpattern instruction that gave a definition of "sexually violent offense" that included 13 categories of offenses enumerated by name. Respondent also tendered seven proposed instructions to the effect that the offenses of public indecency, criminal sexual abuse, and sexual relations within families were not sexually violent offenses.

¶ 55                                    *5. Verdict and Judgment*

¶ 56        At the conclusion of the trial, the jury returned a verdict finding respondent to be a sexually violent person. The trial court entered judgment upon the jury's finding. It also ordered that respondent be committed to the custody of DHS in a secure setting until further order of court and ordered DHS to conduct a predisposition investigation.

¶ 57                        C. Posttrial Proceedings and Commitment Order

¶ 58        The matter was then continued periodically until September 19, 2023, at which time the trial court conducted the dispositional hearing. Respondent testified at that hearing and was questioned about a new disciplinary report that on August 14, 2023, he had been "masturbating at staff" while in the law library of the DHS treatment and detention facility. Respondent denied that this had occurred. At the conclusion of the hearing, the trial court reserved ruling and stated that it wanted to view any report or surveillance video of that incident prior to ruling.

¶ 59        On October 26, 2023, the trial court stated that it had viewed the six minutes of surveillance video that had been supplied to it by the State. The court stated that it saw no corroboration of any report of misconduct on the video and that it was not considering the incident with respect to its dispositional determination.

¶ 60        In ruling, the court stated that based upon the fact that respondent had been in DHS custody for 11 years after serving his original sentence, it was going to "take a chance" and order conditional release. This oral ruling was followed by a written order entered November 6, 2023, in which the court ordered that respondent's commitment be on conditional release, that he remain in secure care pending further order of court, that a conditional release plan be prepared within 60 days, and that he shall be placed upon conditional release upon the court's review and approval of the conditional release plan. It also continued the matter to December 21, 2023, for the trial court's

review and approval of the conditional release plan. On November 13, 2023, respondent filed his first notice of appeal.

¶ 61 On December 8, 2023, the State filed a petition in the trial court seeking to "revoke" conditional release. That petition alleged that on December 1, 2023, another incident occurred in which respondent was observed exposing himself and masturbating during a group therapy session. On December 15, 2023, respondent filed a motion to dismiss the State's petition to revoke conditional release. Respondent argued in that motion that he was not yet "on conditional release," and thus the State's reliance upon the statute governing the revocation of conditional release made its petition legally insufficient. On December 18, 2023, the court held a hearing and denied respondent's motion to dismiss. The trial court stated to respondent's counsel that while "technically I think you're right," the new allegations raised in the State's petition were matters "that would certainly impact this court's decision to place him on conditional release." It thus stated, "So however you want to style it[,] I think we have to set it down for a hearing."

¶ 62 The trial court allowed respondent's counsel time to take depositions on the matter. On April 30, 2024, the State filed an amended petition to revoke conditional release. It alleged that in addition to the incident of December 1, 2023, a second new incident had occurred on March 2, 2024, in which a female staff member had observed respondent lying in his bed without pants and masturbating during that evening's count of the residents.

¶ 63 On June 20, 2024, the trial court conducted an evidentiary hearing at which it heard the testimony of eight witnesses including respondent. The first to testify was Courtney Rhoades, who had been respondent's primary therapist at the DHS treatment and detention facility since July 2022. Her interactions with him were without incident until her last day of working there, December 1, 2023. That day, she and a co-facilitator named William Bowden were facilitating a

mentoring group in which respondent was a participant. She testified that during that session, she observed respondent exposing himself and masturbating, along with a white substance. She exited the room, reported the incident to a security therapy aide, and did not return to the group room.

¶ 64     Bowden was the second witness to testify. He testified that he had not observed anything unusual occur in the group that day, but that Rhoads had left the room and the group was dismissed early after a security therapy aide arrived.

¶ 65     The third witness to testify was Elizabeth Schmidt. She testified that she was a security therapy aide working at the treatment and detention facility on March 2, 2024. She conducted the 11 p.m. count that night, wherein the residents are directed to go into their rooms and lock up. When she walked by respondent's room that night, she observed him lying on his bed without pants and masturbating. The trial court inquired of the witness that the 11 p.m. count occurs every day following an announcement made over a loudspeaker.

¶ 66     The fourth witness to testify was Dr. Hernandez. She testified that she had reviewed respondent's progress notes, treatment plans, and behavioral reports from the year since the trial. Her opinion was that the least restrictive environment appropriate for him was the treatment and detention facility. Her review of behavioral records showed that since the trial, respondent had incurred seven new misconduct violations at the treatment and detention facility; four of these were sexually motivated, and two occurred after he had been granted conditional release. Dr. Hernandez testified that the timing of the two most recent incidents showed that respondent "is struggling to control his behaviors especially with relation to his sexual preoccupation and impulsivity." Her opinion was that respondent's treatment needs to continue in a secure setting because his past progression of committing three times as many incidents in the less-secure setting of the treatment and detention facility than he did at IDOC means that, in an even less secure

environment, "the potential for him to create new victims could potentially increase and be substantial." Her opinion to a reasonable degree of psychological certainty was that respondent is substantially probable to commit new acts of sexual violence if on conditional release, and she does not believe that his care could not be safely managed in the community. However, she also answered no when asked if in her opinion the safety of others required respondent's conditional release to be revoked.

¶ 67        Three residents who had been part of the group on December 1, 2023, all testified on respondent's behalf. All three witnesses denied seeing any incident involving respondent. Respondent himself also testified and denied that either of the incidents to which Rhoades and Schmidt had testified occurred.

¶ 68        After hearing argument, the trial court ruled that it was revoking respondent's conditional release. It stated that it found the testimony of Rhoades to be credible as to the conduct by respondent that she had witnessed, even though other witnesses had testified they had not seen anything. The court also found the testimony of Schmidt to be credible. The court stated that it found it "very troubling" that these incidents had occurred at a time when respondent understood and knew that his conditional release was under consideration by the court. The court stated that the timing of these incidents led it to agree with Dr. Hernandez that respondent was "struggling to control his behavior" in a way that "if gone unchecked, could very well result in a likelihood of much re-offending." Accordingly, the trial court stated that it agreed with Dr. Hernandez's opinion that respondent was substantially probable to commit acts of sexual violence if he was placed on conditional release.

¶ 69        The trial court entered a written order that same day finding that the State had proven by clear and convincing evidence that the safety of others required revocation of respondent's conditional

release, that the State's petition to revoke was granted, and that respondent shall remain in secure care until further order of court. Respondent thereafter timely filed a second notice of appeal, and the two appeals were consolidated in this court.

¶ 70                                II. ANALYSIS

¶ 71                         A. Sufficiency of Evidence

¶ 72     On appeal, respondent's first contention is that the judgment of the trial court should be reversed on the basis that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that he was a sexually violent person. When reviewing claims that challenge the sufficiency of evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements to have been proven beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. Under this standard of review, it is not the function of the appellate court to reweigh the evidence or to retry respondent. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602 (2007). Rather, the trier of fact, which in this case was the jury, is responsible for assessing witness credibility, weighing the testimony and evidence, and drawing reasonable inferences therefrom. *Id.* Thus, we will not substitute our judgment for that of the jury on questions involving the weight of evidence or the credibility of witnesses. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56. We will not reverse a jury's determination that an individual is a sexually violent person unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt on the question. *Id.*

¶ 73     To establish that respondent was a sexually violent person, the State had to prove the following three elements beyond a reasonable doubt: (1) that respondent had been convicted of a sexually violent offense, (2) that he has a mental disorder, and (3) that his mental disorder makes it substantially probable that he will engage in acts of sexual violence. *Fields*, 2014 IL 115542,

¶ 20; see 725 ILCS 207/5(f), 35(d)(1) (West 2022). As to the first element, respondent does not dispute that he was convicted of a sexually violent offense, and his conviction for aggravated criminal sexual assault in case 87-CR-2389 satisfies this element. See 725 ILCS 207/5(e)(1) (West 2022). As to the second and third elements, respondent raises four challenges to the sufficiency of evidence used to establish them. Although these overlap somewhat, two of respondent's challenges are directed at the second element above, and two are directed at the third.

¶ 74                                  *1. Mental Disorder*

¶ 75        For purposes of the Sexually Violent Persons Commitment Act, a "mental disorder" is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b). Respondent's first challenge involves the "predisposition" requirement of this statutory definition. He argues that the evidence failed to prove beyond a reasonable doubt that any of the conditions with which the State's experts diagnosed him *predisposed* him to engage in acts of sexual violence, as opposed to nonviolent acts. His second challenge is that the State failed to prove the mental disorder element because its experts used unreliable evidence to reach their opinions on this issue.

¶ 76        We have previously observed that in sexually violent persons cases, courts rely heavily on the conclusions of expert witnesses exercising professional judgment in assessing whether an individual has a mental disorder that predisposes that person to engage in acts of sexual violence. *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 70; *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 48. In this case, two expert licensed clinical psychologists gave opinions to a reasonable degree of psychological certainty, based upon their training, experience, and review of the relevant information in this case, that respondent suffers from multiple mental disorders that predispose him to engage in future acts of sexual violence. Both Dr. Weldon-Padera

and Dr. Hernandez diagnosed respondent with OSPD nonconsent, exhibitionistic disorder, and ASPD. Dr. Weldon-Padera also diagnosed him with alcohol and cannabis abuse disorders. Both experts explained why in their professional opinions respondent suffers from these mental disorders and why they predispose him to engage in acts of sexual violence. Both explained, in summary, that throughout his incarceration and his time in detention, respondent has continued as a result of his mental disorders to engage in sexually inappropriate behavior toward nonconsenting females, thereby demonstrating that he is unable to control his behavior. Dr. Hernandez testified that his behaviors within detention are "altered" versions of the violent behavior he had committed in the community, which he is unable to repeat in a controlled environment; these behaviors show that he continues to experience arousal toward nonconsenting females that he cannot control. Dr. Hernandez testified that it was significant that respondent had received double the amount of sexual rule violation reports since moving to the less-restrictive setting of the DHS facility than he did during his incarceration at IDOC. Thus, she testified, "in a less restrictive environment than he's in right now, he's capable of engaging in behaviors that he has in the past such as abducting women at knifepoint and raping her on multiple locations."

¶ 77        Respondent's first argument concerning the sufficiency of this evidence is that the evidence showed that four of his purported mental diagnoses fail to meet the statutory requirement of predisposing him to engage in acts of sexual violence. These were his diagnoses of exhibitionistic disorder, ASPD, cannabis use disorder, and alcohol abuse disorder. Respondent cites the experts' testimony that none of these four disorders, acting alone, predisposed him to engage in acts of sexual violence. However, we agree with the State that this point by respondent is irrelevant because the expert testimony was clear that these disorders operated in connection with his OSPD nonconsent to predispose respondent to commit acts of sexual violence and increase his risk of

recidivism. There is no statutory requirement that each individual mental disorder with which a person is diagnosed must independently predispose him or her to engage in acts of sexual violence, and evidence that multiple conditions operate in conjunction with one another to predispose a person to engage in acts of sexual violence may satisfy the definition of a mental disorder. *White*, 2016 IL App (1st) 151187, ¶ 46.

¶ 78       Respondent also challenges the sufficiency of the evidence of his OSPD nonconsent diagnosis. While we find respondent's precise argument on this point to be somewhat difficult to track, we understand his argument to be that a diagnosis of OSPD nonconsent *which predisposes a person to engage in acts of sexual violence* requires the State to prove more than one act of sexual violence occurring over a period lasting longer than six months. From this premise, he argues that the State's experts cited only one act of sexual violence in his past, *i.e.*, his 1987 offense, with all other behaviors cited being nonviolent offenses. He criticizes Dr. Weldon-Padera for attempting to make up for "the lack of evidence for the six-month requirement" by relying upon his three juvenile cases, about which she had no information that any acts of sexual violence occurred. He also criticizes Dr. Hernandez for attempting to "meet the six-month criteria" by using nonviolent sexual offenses and "blurring the lines" between his exhibitionistic disorder and OSPD nonconsent diagnoses.

¶ 79       We reject respondent's arguments on this point also. First, respondent cites no statutory support for this argument that the State is required to prove more than one prior act of sexual violence. Instead, we agree with the State that the Sexually Violent Persons Commitment Act does not require proof that respondent committed more than one prior act of sexual violence before a trier of fact can find that he has a mental disorder that predisposes him to engage in acts of sexual violence. See 725 ILCS 207/5(b), (f) (West 2022). Second, we find nothing in the testimony or

evidence at trial supporting any form of "six-month" requirement or criteria concerning this diagnosis. No testimony or evidence was presented that there must be a showing of multiple prior sexually violent acts over a period longer than six months to support a diagnosis of OSPD nonconsent that predisposes a person to engage in acts of sexual violence. Instead, both expert witnesses testified to a reasonable degree of psychological certainty that respondent met the diagnostic criteria for OSPD nonconsent and that it predisposes him to engage in acts of sexual violence. They explained the reasons for their opinions, and nothing about this testimony is improbable or unsatisfactory so as to leave a reasonable doubt on the question. *White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 80        Respondent also argues that Dr. Weldon-Padera improperly sought by her testimony to shift the burden of proof onto him to disprove that he was predisposed to engage in acts of sexual violence due to his OSPD nonconsent diagnosis. This argument is based on Dr. Weldon-Padera's testimony explaining why respondent's OSPD nonconsent predisposes him to engage in acts of sexual violence, wherein she stated, "*He hasn't shown* that he can control these urges, impulses, arousal, and behaviors given that he continues to act on them throughout the decades that he's been at the detention center." (Emphasis added.) This statement clearly refers to the showing respondent is required to make in sex-offender treatment at the DHS treatment and detention facility, not the showing he must make in court. The argument that this isolated comment improperly shifted the burden of proof onto him is meritless.

¶ 81        Respondent makes a second, related challenge to the sufficiency of the State's evidence to prove that he had a "mental disorder" within the statutory definition. He argues that the State's experts used unreliable evidence to conclude that he had exhibited a "pattern" of behavior that supported the diagnosis of OSPD nonconsent. For example, he criticizes Dr. Weldon-Padera's use

of his three juvenile cases in concluding that he had shown a pattern since adolescence of desire for sexual behaviors with unwilling females, even though she acknowledged that she had minimal details beyond the charges that any of those cases involved sexual behaviors with unwilling females. He similarly criticizes Dr. Hernandez's use of nonviolent sexual acts during his incarceration and his 1981 juvenile case to conclude that he had displayed a pattern supportive of an OSPD nonconsent diagnosis. He heavily emphasizes the fact that, following the 2013 probable cause hearing in this case, the trial court twice stated that the unavailability of the records from his three juvenile cases rendered them unreliable as bases for diagnosing respondent with what was then termed paraphilia NOS nonconsent.

¶ 82    We again reject respondent's arguments for reversal based upon the experts' use of purportedly unreliable evidence in forming their opinions. The factual basis for the opinion of an expert witness is a matter generally held to go to the weight of the evidence, not its sufficiency, and decisions regarding the weight to be given expert testimony are for the jury to determine in light of the expert's credentials and the factual basis of the opinion. *Snelson v. Kamm*, 204 Ill. 2d 1, 26-27 (2003). The above shortcomings in the experts' knowledge about the facts of respondents' juvenile cases and the fact that none of respondents' behavior while incarcerated or in detention amounted to acts of violence were thoroughly exposed through vigorous and able cross-examination by respondents' counsel. Nevertheless, the jury apparently credited the experts' testimony that the respondent suffered from a mental disorder within the meaning of the statute, and we will not substitute our judgment for that of the jury on such matters going to the weight of evidence or the credibility of witnesses. *White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 83                    *2. Substantial Probability to Engage in Sexually Violent Acts*

¶ 84    Respondent also raises two challenges to the third element that the State was required to

prove beyond a reasonable doubt, which was that respondent's mental disorder makes it "substantially probable that [he] will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2022). In this context, "substantially probable" means "much more likely than not." *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000). Respondent's first challenge to the sufficiency of the evidence used to prove this element is that it failed to prove that he was substantially probable to engage in acts of sexual "violence," as opposed to nonviolent offenses or acts. His second challenge is that the State's evidence that he would engage in sexually violent acts in the future was too weak to prove "substantial probability."

¶ 85    On this element, both Dr. Weldon-Padera and Dr. Hernandez expressed opinions to a reasonable degree of psychological certainty that respondent was substantially probable to commit acts of sexual violence in the future if he was not in appropriate custody or treatment. Both experts testified to reaching this opinion after performing an assessment of his recidivism risk that involved using actuarial assessments of risk based on "static," unchanging risk factors; an assessment of "dynamic" risk factors that could change with treatment; and consideration of any protective factors present in his case. On the Static-99R actuarial test, both experts gave respondent a score of 7 and testified that this score placed him in the highest risk category among all sex offenders to sexually reoffend. On the Static-2002R actuarial test, Dr. Weldon-Padera gave respondent a score of 7 and testified again that this score placed him in the highest risk category to reoffend. Dr. Hernandez gave respondent a score of 6 on this assessment and testified that this score placed him in the second-highest category of risk to reoffend. Furthermore, both experts engaged in a comprehensive explanation of various dynamic risk factors, which had been shown by research to correlate to higher rates of recidivism among sex offenders, that they concluded to be present in respondent's case. And both experts explained why no protective factors, including

age, were present in respondent's case that lowered his risk to reoffend.

¶ 86    As stated above, respondent's first argument is that the evidence offered to prove this element of the State's case was insufficient because it failed to prove that it is substantially probable that he will engage in acts of sexual "violence," as opposed to engaging in sexual acts that are nonviolent. He contends that the evidence proved at most that he had a predisposition to commit sexual acts that do not involve violence, such as conduct that might qualify as public indecency, criminal sexual abuse, or sexual relations within families. See 720 ILCS 5/11-1.50, 11-11, 11-30 (West 2022). He is critical of the fact that the two actuarial tests used by both experts do not distinguish between the risk of sexually violent recidivism and the risk of recidivism involving sexually nonviolent offenses. He is also critical of Dr. Weldon-Padera's use of his 1981 and 1983 juvenile cases to give him a score of 7 on the Static-2002R, instead of a score of 6 as Dr. Hernandez did, where Dr. Weldon-Padera did not know the basis for his adjudication of delinquency in the 1981 case and knew he was not charged with a sexual offense in the 1983 case. As for the experts' assessment of dynamic risk factors, he cites the cross-examination of Dr. Hernandez that she did not know whether any of the dynamic risk factors had any relationship to sexually violent recidivism, only that they had small correlations or effects on overall sexual recidivism. He similarly cites the fact that Dr. Weldon-Padera's direct examination testimony was only that these dynamic risk factors were "associated with" or "related to" sexual recidivism, not that they increased respondent's risk of engaging in sexually violent offenses.

¶ 87    We again reject this argument. We find it to be nothing more than a challenge to the factual bases of the witnesses' opinions that respondent is substantially probable to commit acts of sexual violence in the future, and such matters go to the weight of evidence, not its sufficiency. *Snelson*, 204 Ill. 2d at 26. It was thus the province of the jury to decide the weight to give to the experts'

opinions after being made aware on cross-examination of any shortcomings in the evidence upon which they relied. We do not substitute our judgment for that of the jury on such questions of weight of evidence and witness credibility. *White*, 2016 IL App (1st) 151187, ¶ 56. Also, as to respondent's final point that Dr. Weldon-Padera testified only that the dynamic risk factors were "associated with" or "related to" sexual recidivism, we add that we do not require that experts use any specific, precise, or exact language when testifying to the causal connection between a respondent's mental disorder and the risk of sexually violent recidivism. *Montanez*, 2020 IL App (1st) 182239, ¶ 76.

¶ 88　　　　Respondent's second sufficiency-of-evidence challenge to this element is closely related to the first. In essence, he cites largely the same shortcomings in the evidence as set forth above and argues that they show that the evidence was too weak to constitute proof of "substantial probability" that he will engage in acts of sexual violence. In doing so, respondent compares the testimony in this case to that of *In re Commitment of Gavin*, 2024 IL App (1st) 230246, and a nonprecedential order from *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U.

¶ 89　　　　Unlike the initial petition at issue in this case, *Gavin* involved a petition for discharge by a petitioner who had previously been adjudicated a sexually violent person. *Gavin*, 2024 IL App (1st) 230246, ¶ 1. Following a jury determination that the petitioner remained a sexually violent person, the petitioner challenged whether the State had proven by clear and convincing evidence that he remained "substantially probable" to engage in acts of sexual violence. This court reversed, finding that the State's expert's use of internally conflicting or absent rationale for his opinions constituted manifest error. *Id.* ¶ 69. The petitioner was 64 years old at the time of trial, used a cane for ambulation, and had undergone surgeries for hip replacement and the removal of a testicle. The court found it problematic that the expert had scored petitioner on the static assessment tests as if

he was 37 years old and then testified that he was " 'about as high risk as you're going to get,' " despite acknowledging that his present age of 64 should have resulted in lower scores. *Id.* ¶¶ 49-51. The court also found that the expert had failed to explain the significance to his risk assessment of a single incident of exposure by the petitioner that had occurred when he was over age 60 and why the petitioner remained substantially probable to commit sexually violent acts despite his limited mobility and other health problems. *Id.* ¶¶ 58-64.

¶ 90        In *McCormack*, a panel of this court held in a nonprecedential order that the evidence had failed to prove substantial probability where both of the State's experts had testified that the respondent was at a low statistical risk to reoffend based upon the actuarial tests. *McCormack*, 2021 IL App (1st) 181930-U, ¶ 28. Thus, the trial court, which was conducting a bench trial, relied upon the testimony as to dynamic risk factors. However, one of the dynamic factors upon which the trial court had relied, involving the respondent's ability to sexually self-regulate, was one that the State's expert had "rejected outright" as inapplicable in the respondent's case. *Id.* ¶ 32. The trial court had also found that the respondent's failure to participate in sex-offender treatment had "increased" his risk to reoffend, which was not an accurate characterization of the testimony. *Id.* ¶ 33. Finally, the appellate court stated that it had been "left to guess" from the testimony why certain identified dynamic risk factors increased the respondent's risk of violently reoffending and that overall, the expert's testimony left "too much to inference" on the question. *Id.* ¶¶ 35, 42.

¶ 91        We reject respondent's argument that the evidence in this case suffered from any of the problems that existed in *Gavin* or *McCormack*. Here, the two experts testified that respondent's actuarial test scores placed him in the highest risk category among all sex offenders to reoffend, except that Dr. Hernandez scored him in the second-highest risk category on the Static-2002R test only. And unlike in *Gavin* or *McCormack*, we find that Dr. Weldon-Padera and Dr. Hernandez

adequately explained the reasons why the dynamic risk factors they identified were present in respondent's case and informed their overall clinical judgments that he was substantially probable to engage in acts of sexual violence. It is the province of the jury to evaluate the expert testimony concerning the risk of recidivism shown by actuarial test results in conjunction with all of the other evidence presented to determine whether a respondent is "substantially probable" to reoffend. *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 25. The witnesses' testimony on these points was sufficient to support the jury's verdict, and none of the reasons argued by respondent are a basis to disturb it.

¶ 92 In conclusion, we hold that a rational trier of fact could determine from the evidence presented that all elements necessary to establish that respondent was a sexually violent person were proven beyond a reasonable doubt.

¶ 93 B. Trial Errors

¶ 94 *1. Evidentiary Errors*

¶ 95 Respondent also urges this court to reverse the judgment and remand this case for a new trial due to various alleged trial errors that prejudiced his right to a fair trial. His first argument is that the trial court erred in allowing the State to elicit unreliable hearsay evidence under the guise of basis-of-opinion testimony. Specifically, respondent contends that the State's witnesses should not have been able to disclose the contents of the document referred to as the "statement of facts," which was created by the office of the State's Attorney as part of respondent's 1987 case. Dr. Weldon-Padera used this statement of facts to testify that respondent's motive for his 1983 juvenile case involving home invasion had been to sexually assault a young woman but that he had been interrupted by family members before he could do so. Respondent again emphasizes that in 2013, the judge conducting the probable cause hearing had found this evidence to be unreliable.

Additionally, respondent complains about both experts' disclosure of the contents of certain IDOC and DHS disciplinary records involving specific incidents of sexual misconduct. We review alleged evidentiary errors for abuse of discretion. *Montanez*, 2020 IL App (1st) 182239, ¶ 80.

¶ 96 An expert witness may give opinion testimony that relies upon facts not in evidence, as long as the underlying information is of a type reasonably relied upon by experts in the particular field. *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 43; see Ill. R. Evid. 703 (eff. Jan. 1, 2011). Expert witnesses are further permitted to reveal to the jury the contents of the materials upon which they have reasonably relied for the purpose of explaining the basis of their opinions. *Tenorio*, 2020 IL App (1st) 182608, ¶ 43. Prohibitions on the admission of hearsay evidence are not violated in this circumstance because the underlying facts are not being offered for their truth but for the limited purpose of explaining the factual basis for the expert's opinion. *People v. Lovejoy*, 235 Ill. 2d 97, 142-43 (2009). However, if the basis for an expert's opinion is so uncertain that it reaches the level of speculation, then the opinion should not be allowed. *Montanez*, 2020 IL App (1st) 182239, ¶ 121; accord *Dyback v. Weber*, 114 Ill. 2d 232, 244 (1986) (an expert's opinion cannot be based upon conjecture and guess).

¶ 97 Upon the record presently before us, we have no basis to conclude that it was error to allow Dr. Weldon-Padera to disclose to the jury the contents of the statement of facts prepared by the office of the State's Attorney as part of the 1987 case. Importantly, the statement of facts itself is not contained in the record on appeal. As such, we are unable to conduct any meaningful review of this document to assess whether anything about it makes it too unreliable to serve as a basis for the opinions expressed by Dr. Weldon-Padera. We reiterate our statement from *Montanez* that it is imperative that counsel ensure that the records upon which challenged opinions are based be included in the record on appeal so that this court can evaluate whether experts have based their

opinions on unreliable sources of information. *Montanez*, 2020 IL App (1st) 182239, ¶ 121.

¶ 98     The principle of "reliability" in this context "centers on whether 'the underlying facts or data upon which [the expert] seeks to base an opinion are of a type reasonably relied upon by experts in the particular field.' " *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 124 (quoting *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186 (1990)). Respondent's motion *in limine* on this issue indicates that the document referred to as the "statement of facts" was the type of document that the State's Attorney is required to prepare and file when a defendant is sentenced to IDOC. See Ill. Rev. Stat. 1987, ch. 38, ¶ 1005-4-1(d). Such document is transmitted to IDOC for the purpose of furnishing it "with the facts and circumstances of the offense for which the person was committed together with all other factual information accessible to them in regard to the person prior to his commitment relative to his habits, associates, disposition and reputation," along with any other facts or circumstances that may aid IDOC while that person is in custody. *Id.* Nothing about a document of this type strikes us as being inherently unreliable as a basis for use by psychologists in sex-offender evaluations. The necessary foundation was laid when Dr. Weldon-Padera testified that court records, criminal records, IDOC records, and DHS records are all types of records that clinical psychologists reasonably rely upon when conducting sex-offender evaluations. Accordingly, the trial court did not abuse its discretion in allowing the State to elicit from Dr. Weldon-Padera testimony as to the contents of the statement of facts from respondent's 1987 case that formed a basis of her opinions.

¶ 99     The same analysis applies to respondent's argument that the trial court should not have allowed the expert witnesses to disclose the facts of the disciplinary tickets that he received for incidents of sexual misconduct at IDOC and DHS. Again, the records themselves are not included within the record on appeal. Nothing about them strikes us as inherently unreliable. And both

experts testified that these IDOC and DHS records are of a type reasonably relied upon by experts in their field when conducting sex-offender evaluations. The trial court did not abuse its discretion in allowing this testimony.

¶ 100    Respondent also cites *Smith v. Arizona*, 602 U.S. 779 (2024), for the proposition that the testimony discussed above was improper as basis-of-opinion testimony because it depended upon the truth of the matters asserted. However, we do not read *Smith* to support such a broad proposition, and we find it inapposite to the present case. *Smith* involved a criminal prosecution for drug offenses. Forensic testing of seized evidence had been performed by a laboratory analyst who ultimately did not testify at trial. Instead, a different forensic expert had testified at trial and expressed opinions based largely upon a report and notes that the nontestifying analyst had prepared about the tests she performed. The testifying expert disclosed the methods and results of the tests performed by the nontestifying analyst in explaining the basis of his opinion. *Id.* at 790-91. The issue before the United States Supreme Court was whether the Confrontation Clause of the Sixth Amendment barred the testifying expert from disclosing facts associated with the forensic testing performed by the nontestifying analyst, notwithstanding that those facts served as a basis for the testifying expert's opinion. *Id.* at 783.

¶ 101    The Confrontation Clause applies in criminal prosecutions to protect the right of the accused to be confronted with the witnesses against him. *Id.* Because the Confrontation Clause prohibits only "testimonial hearsay," the court first considered whether such evidence constituted hearsay. *Id.* at 792. The court reasoned that, although the evidence at issue might be considered non-hearsay as a matter of state evidence law, the question of whether the statements were admitted for their truth for purposes of the constitutional right to confrontation did not turn on evidentiary rules. *Id.* at 793-94. Relevant here, the court held that the results of testing performed by the nontestifying

analyst were admitted for their truth despite the fact that they were disclosed to explain the basis of the testifying expert's opinion. *Id.* at 795-800. It stated, " 'The whole point' of the prosecutor's eliciting such a statement is 'to establish—*because of the [statement's] truth*—a basis for the jury to credit the testifying expert's' opinion." (Emphasis in original.) *Id.* at 795 (quoting *Stuart v. Alabama*, 586 U.S. 1026, 1028 (2018) (Gorsuch, J., dissenting from denial of certiorari)). This implicates the Confrontation Clause because "the defendant has no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work." *Id.* at 796. However, the Supreme Court went on to remand the case for the lower courts to determine whether the hearsay statements at issue were also "testimonial" so as to be prohibited under the Confrontation Clause. *Id.* at 800-02.

¶ 102    Respondent makes no argument that the Confrontation Clause applies in these commitment proceedings, which are "civil in nature." See 725 ILCS 207/20 (West 2022). Accordingly, whether the contents of the statement of facts or respondent's disciplinary tickets would constitute hearsay for purposes of the Confrontation Clause if disclosed as basis-of-opinion testimony in a criminal prosecution is inapposite to the argument before us. We deal here only with a question as to the admissibility of evidence as a matter of state evidence law in a civil proceeding. We therefore find *Smith* to be of no aid to respondent's argument. The precedent of this court is clear that basis-of-opinion testimony is permissible in cases under the Sexually Violent Persons Commitment Act under Illinois law, and we will continue to follow this precedent unless a higher court holds otherwise. See *In re Commitment of Mitts*, 2025 IL App (1st) 230821-U, ¶ 110 n.1.

¶ 103                                          *2. Closing Argument*

¶ 104    Respondent's next argument is that he suffered substantial prejudice as a result of multiple improper statements by the two prosecutors who made closing and rebuttal arguments on behalf

of the State. First, he argues that the prosecutors improperly argued facts disclosed as basis-of-opinion testimony as if they were substantive evidence that had been admitted for their truth. He further argues that a prosecutor compounded this improper argument by vouching for its truth. Second, he argues that a prosecutor unfairly inflamed the jury's passions by twice pointing to the courtroom doors and arguing that respondent would walk out of them if the jury did not find him to be a sexually violent person.

¶ 105    The prosecution is afforded wide latitude in making closing arguments so long as the comments made are based upon the evidence or reasonable inferences drawn therefrom. *Tenorio*, 2020 IL App (1st) 182608, ¶ 42. Prosecutors may comment on the credibility of the witnesses and the defense's characterizations of the evidence or the case, and they may respond in rebuttal to statements by defense counsel that clearly invite a response. *Id.* When this court is asked to review a challenge to remarks made by a prosecutor during closing arguments, we consider them in the context of the entire closing arguments made by both parties. *Id.* We will not reverse a jury's verdict based upon improper remarks unless the comments were of such magnitude that they resulted in substantial prejudice to the respondent and constituted a material factor in the verdict. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 30; *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42.

¶ 106    As discussed in the preceding section, an expert witness may express opinion testimony that relies upon facts not in evidence, provided the underlying information is of a type reasonably relied upon by experts in the particular field. *Tenorio*, 2020 IL App (1st) 182608, ¶ 43. An expert is further permitted to disclose to the jury the contents of the materials upon which he or she has relied for the purpose of explaining the basis of the opinion expressed. *Id.* However, the underlying facts that serve as the basis for the expert's opinion are not considered substantive evidence unless

separately admitted. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 68. A prosecutor must avoid arguing such basis-of-opinion evidence as substantive during closing argument. *Id.*

¶ 107    Respondent contends that prosecutors argued the facts of his prior offenses and disciplinary tickets as substantive evidence, notwithstanding that these facts were disclosed to the jury only as basis-of-opinion testimony. He challenges as improper the prosecutors' statements that (1) he was convicted at age 16 of a home invasion that had a sexual motivation, (2) at age 20 he abducted a woman at knifepoint, drove her around, and sexually assaulted her multiple times, (3) at age 56 he had an incident of sexual misconduct at the treatment and detention facility, and (4) while in the community he targeted a specific female and raped her, whereas in detention he repeatedly targets nonconsenting females to expose himself and masturbate in the presence of.

¶ 108    We reject respondent's contention that the challenged statements constituted improper closing argument. When we consider the challenged statements in the context in which they were made, we find them to be part of a proper argument based upon the evidence that respondent had ASPD, which acted in conjunction with his OSPD nonconsent and exhibitionistic disorder and predisposed or made him substantially probable to engage in acts of sexual violence. The context in which the first two challenged statements above were made was part of the prosecutor's broader explanation that the experts had diagnosed respondent with multiple mental disorders that met the statutory requirement of predisposing him to engage in acts of sexual violence. They followed shortly after an explanation that ASPD was one of the disorders with which both experts had diagnosed respondent, and that the testimony had shown that ASPD acted in conjunction with OSPD nonconsent and exhibitionistic disorder and made them worse in the sense that respondent "doesn't care what happens" and "doesn't adhere to rules." The prosecutor then reminded the jury that it "heard about this with his criminal history and some of his criminal behavior that he had

throughout the years."

¶ 109    The prosecutor then went on to address the various terms and phrases included in the statutory definition of "mental disorder," the last of which was that it "predisposes [respondent] to commit acts of sexual violence." The prosecutor argued that respondent's mental disorders satisfied this aspect of the definition because he has "a lifelong pervasive pattern of sexually acting out. While in the community he was charged with sex offenses as a juvenile. *He was convicted of a home invasion at age 16 that had sexual—that had some sexual motivation to it*." (Emphasis added.) When he was 20 years old and on parole, he committed aggravated criminal sexual assault. "*That's where he abducted the woman at knife point, drove her around, went to two separate locations where he sexually assaulted her in two different manners.*" (Emphasis added.) The prosecutor concluded this point by stating that this "shows that [respondent] is dangerous due to his mental disorder of [OSPD]. He's engaged in sex acts with noncompliant persons, and it also shows that he's dangerous because he has [ASPD]. He doesn't care who he harms while acting on his sexual urges."

¶ 110    The third challenged comment above was also made in the context of discussing respondent's diagnosis of ASPD and specifically why the evidence showed that it continued to place him at risk of engaging in acts of sexual violence despite his age. Discussing testimony of the risk factors present in respondent's case, the prosecutor referenced that one such risk factor was his ASPD. The prosecutor then stated, "And you heard both of the doctors tell you that when people get older, this disorder tends to wane, it doesn't seem to be as obvious. But for [respondent], that's not the case. *[Respondent], at age 56, has a sexual misconduct at the treatment and detention facility not six months from the day of his trial*." (Emphasis added).

¶ 111    The fourth challenged comment occurred in rebuttal argument. It was made in response to

respondent's counsel's emphasis in closing that the evidence did not show beyond a reasonable doubt that respondent was predisposed to engage in sexually "violent" acts and that there had been no evidence that he had attempted any sexual act amounting to violence while in detention. The prosecutor stated in rebuttal:

"It is true they are not sexually violent offenses. Nobody told you they were. Dr. Hernandez told you that exposing himself and masturbating in front of all of these female staff members, these are adjacent behaviors. ***

She means that when he exposes himself and masturbates like this, it's because he's not able to offend in the TDF [(treatment and detention facility)] in the same way that he's able to offend in the community. Different environment. His behavior adapted to his new environment. It shifted a little. It became a replacement for rape. How he engages in these behaviors in the TDF is also very similar to how he engaged in the sexually violent offense in the community. *When he was in the community, he targeted a specific female. He abducted her. He took her to different places. He repeatedly—*

MS. LEVINE [(RESPONDENT'S ATTORNEY)]: Objection, basis of opinion.

THE COURT: Overruled.

MS. ZYZNAR [(ASSISTANT ATTOREY GENERAL)]: *—repeatedly raped her and paraded her around his other girlfriends. In the TDF he targets specific females.*

MS. LEVINE: Same objection, Judge.

THE COURT: Overruled.

MS. ZYZNAR: *He repeatedly exposes himself and masturbates while they say no and stop. Respondent wants you to believe that these are wildly different situations and wildly different offenses. But in this case, they're very similar at the core. The heart of it is the same.*

*He's clearly still aroused to nonconsenting women. They say no, he keeps going. They cry, he keeps going. They say stop, I don't want to see your penis, I'm at work, he keeps going. He likes this—*

MS. LEVINE: Objection, basis of opinion.

THE COURT: Overruled.

MS. ZYZNAR: *He seeks it out.* They're adjacent. They cannot just be parsed out completely. All the experts were saying yesterday is that if he were to be placed back into the community, his pattern of behavior is substantially probable to shift back to what he did in the community. It's substantially probable to shift back to committing a sexually violent offense." (Emphases added.)

¶ 112 In our view, the challenged statements above were fair comments and arguments based upon the evidence and testimony at trial. It is evident in context that the statements about respondent's crimes or disciplinary tickets were argued to the jury as reasons or bases for the experts' opinions, in particular that they were facts supporting the experts' diagnosis of ASPD and that, in conjunction with his other diagnosed mental disorders, it predisposed him or made him substantially likely to engage in acts of sexual violence despite his age of 56 years. Further, the fourth challenged comment above was permissible rebuttal to respondent's counsel's argument and characterization of the evidence in closing. We do not find any of these comments to be basis-of-opinion testimony argued as substantive evidence.

¶ 113 We find the comments above to be far different than the prosecution argument that this court found to warrant reversal in *Gavin*, 2014 IL App (1st) 122918, upon which respondent relies. In that case, the prosecutor extensively detailed the facts of the respondent's prior crimes in both opening statement and closing argument with minimal statements as to how they served as bases

for the experts' opinions that the respondent suffered from a mental disorder. *Id.* ¶¶ 11-12, 26-27, 71. This court found that the extensive narrative presentation of respondent's past crimes "at times reads as if Gavin was on trial for rape" and misdirected the focus of the case by "disconnecting the underlying facts and the experts' use of them." *Id.* ¶ 74. This was further compounded by the prosecutor's use of an "extreme" level of sarcasm when addressing the effect of the respondent's health problems on his risk of reoffending. *Id.* ¶¶ 64-65. We find no argument of a similarly problematic nature to have occurred in the present case.

¶ 114    Respondent also argues that improper vouching occurred during rebuttal closing when the prosecutor stated "[w]e know this" in the context of an argument that respondent did not have the same opportunity in the treatment and detention facility to abduct, rape, or parade a woman around as he had done in the community. It is prejudicial error for a prosecutor to express personal beliefs or opinions, or invoke the integrity of the prosecutor's office, to vouch for the credibility of a prosecution witness. *People v. Boling*, 2014 IL App (4th) 120634, ¶ 126. However, we deem the challenged statement in this case merely to be an offhand remark that did not constitute improper vouching. In this context, the statement "we know this" is no more expressive of a prosecutor's personal opinion than stating to the jury "you know this." See *id.* ¶ 127.

¶ 115    Finally, respondent argues that the State engaged in improper and prejudicial argument when on two occasions during rebuttal the prosecutor pointed to the courtroom doors and told the jury that respondent would "walk out these doors" and back onto the street if it did not find him to be a sexually violent person. It is improper for a prosecutor to make remarks for the sole effect of inflaming the jury's passions or developing its prejudices without casting any light on the issues of the case. *People v. Short*, 2020 IL App (1st) 162168, ¶ 76.

¶ 116    We reject respondent's argument that the prosecutor's use of the phrase "walk out these

doors" was improper. As we referenced above, one of the main points of respondent's counsel's closing argument was that there had been no evidence that he had attempted any sexual act amounting to violence while in detention. The prosecutor's use of this phrase occurred in rebutting this argument, to emphasize to the jury that it was considering respondent's probability to commit acts of sexual violence in the community, not within the treatment and detention facility. In elaborating on this distinction, she first stated, "If he were to walk out that door back on the street, how risky is he? Is he substantially probable to commit an act of sexual violence? That's what we're talking about." And later: "He doesn't try to rape somebody at the TDF because he knows he'll get caught because he's smart of enough to know that. That's why he hasn't done it. That is not evidence that he wouldn't walk out these doors and be substantially probable to do it again." In context, this was a fair rebuttal argument based upon the evidence. We do not view its purpose as inflaming the jury's passions or exhorting the jury to focus on the consequences of its verdict without regard to the evidence.

¶ 117                    *3. Jury Instructions*

¶ 118        Respondent next argues that the trial court abused its discretion by denying eight of his tendered jury instructions. On the whole, these instructions sought to instruct the jury as to 13 categories of offenses, enumerated by title, that are considered "sexually violent offenses" under section 5(e) of the Sexually Violent Persons Commitment Act (725 ILCS 207/5(e) (West 2022)); to inform it that the offenses of public indecency, criminal sexual abuse, and sexual relations within families are not sexually violent offenses; and to define the elements of public indecency, criminal sexual abuse, and sexual relations within families. Respondent argues that these tendered instructions were crucial to his defense to limit the jury's consideration of the "mental disorder" and "substantial probability" elements of the State's case, both of which required the jury to assess

- 44 -

his risk of engaging in acts of sexual violence rather than sexually nonviolent acts.

¶ 119     The decision whether to provide a particular jury instruction rests within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 50. Jury instructions should not be misleading or confusing. *People v. Brown*, 2015 IL App (1st) 131552, ¶ 42. Our task when presented with a challenge involving jury instructions is to determine whether the instructions, considered together, fully and fairly announced the law applicable to the theories of the State and defense. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008).

¶ 120     In declining to give these eight tendered instructions, the trial court reasoned that they might confuse the jury into believing that the State had a burden of proving that the other crimes with which respondent had been charged prior to 1987 or the subsequent acts attributed to him while in custody constituted sexually violent offenses. We agree with the trial court that giving these proposed instructions to the jury had a high potential of confusing or misleading it about what the State had the burden of proving concerning sexually violent offenses. We reject respondent's contention that instructing the jury as to various offenses that are and are not sexually violent offenses was necessary to his defense against proof that he was predisposed or substantially probable to engage in acts of sexual violence. See 725 ILCS 207/5(b), (f) (West 2022). Accordingly, we find no abuse of discretion in the trial court's refusal of the tendered instructions.

¶ 121                              *4. Cumulative Error*

¶ 122     Having rejected all of respondent's claims of trial error, we need not consider his argument that cumulative error denied him a fair trial.

¶ 123                              C. Commitment Order

¶ 124     In addition to the issues stemming from his jury trial, respondent also raises several

arguments pertaining to the trial court's order committing him to institutional care in a secure facility. This occurred after the trial court had initially found respondent eligible for conditional release. Respondent urges us to reverse the order committing him to secure care and remand the case for further consideration of a conditional release plan. A brief explanation of the procedural history surrounding this ruling is helpful to an understanding of the arguments made by both sides concerning this issue.

¶ 125    Following the dispositional hearing, the trial court orally ruled on October 26, 2023, that due to the length of time respondent had been incarcerated and in DHS custody, it was going to "take a chance" and order conditional release. That oral ruling was followed by a written order entered November 6, 2023. That written order provided that (1) respondent's commitment shall be on conditional release, (2) respondent will remain in secure care at the DHS treatment and detention facility until further order of court, (3) DHS and Liberty Healthcare shall prepare a conditional release plan within 60 days, (4) upon review and approval of the conditional release plan, respondent shall be placed on conditional release, and (5) the matter was continued to December 21, 2023, for the trial court's review and approval of the conditional release plan.

¶ 126    Notwithstanding that this order contemplated the preparation and court approval of a conditional release plan before respondent was placed on conditional release, we glean from the record that both sides, at least initially, viewed this as a final order. Accordingly, on November 13, 2023, respondent filed a notice of appeal. On December 8, 2023, the State filed in the trial court a petition to "revoke" conditional release, citing section 40(b)(4) of the Sexually Violent Persons Commitment Act (725 ILCS 207/40(b)(4) (West 2022)). It asserted that on December 1, 2023, respondent had engaged in a new incident of exposure and masturbation during a group therapy session. On December 15, 2023, respondent filed a motion to dismiss the State's petition to revoke

conditional release on grounds of legal insufficiency. See 735 ILCS 5/2-615(a) (West 2022). The legal insufficiency identified in respondent's motion to dismiss was that section 40(b)(4) contemplates the filing of a petition to revoke conditional release "[a]t any time during which the person is on conditional release" (725 ILCS 207/40(b)(4) (West 2022)), and respondent was not "on conditional release" because the court had not yet approved his conditional release plan.

¶ 127    On December 18, 2023, the trial court heard arguments on respondent's motion to dismiss. The State acknowledged the technical accuracy of respondent's argument. However, the prosecutor stated that a petition to "revoke" under section 40(b)(4) was "the only way to put the issue back in front of the court" in the event "something happens after the 30 day motion to reconsider period ends" but before the end of the 60-day period allowed by statute for the preparation and approval of a conditional release plan. The trial court likewise acknowledged the technical accuracy of respondent's argument, but it nevertheless denied his motion to dismiss. The trial court stated that "however you want to style it," the State's petition raised new factual matters "that would certainly impact this court's decision to place him on conditional release." The trial court ultimately held an evidentiary hearing on June 20, 2024, granted the State's petition to revoke conditional release, and ordered that respondent remain in secure care until further order of court.

¶ 128    On appeal, respondent raises two arguments in the alternative. First, he argues that the trial court erred in denying his motion to dismiss despite acknowledging that, because respondent was not yet "on conditional release," section 40(b)(4) did not allow a petition to "revoke" conditional release. Second, and in the alternative, he argues that the trial court was divested of jurisdiction to change his commitment status from conditional release to secure care once he filed his notice of appeal of the trial court's dispositional order on November 13, 2023. He contends that the trial court's order of October 26, 2023, was a final and appealable order.

¶ 129   In response to both of respondent's arguments above, the State contends that the trial court's dispositional ruling of October 26, 2023, and written order of November 6, 2023, was an interlocutory order that the trial court retained the inherent authority to modify at any time prior to judgment. Thus, the State argues, denial of respondent's motion to dismiss was proper because the trial court correctly focused on the substance of the State's petition, not its legal labeling, and treated it as a motion to reconsider an interlocutory order. The State similarly argues that the trial court was not divested of jurisdiction by respondent's filing of a notice of appeal from an order that was not final or appealable.

¶ 130   The resolution of these interrelated arguments requires us to first address whether the ruling of October 26, 2023, and written order of November 6, 2023, constitutes an interlocutory order or a final and appealable order. We acknowledge that some lack of clarity appears to exist in the law as to whether the final order in this context is the one that allows conditional release or the one approving the conditional release plan. In 2010, our supreme court accepted a petition for leave to appeal in a case that presented this issue but declined to resolve it on the basis that the appeal before it was moot. See *In re Commitment of Hernandez*, 239 Ill. 2d 195, 201 (2010). In doing so, it also vacated the judgment of the appellate court on grounds of mootness. *Id.* at 203. The supreme court suggested that a party who remained genuinely uncertain as to what constituted the final order in this context "may always protect itself by filing multiple notices of appeal." *Id.* at 204.

¶ 131   An issue similar to this was addressed in *In re Commitment of Hansen*, 2024 IL App (3d) 230334. There, the appellate court held in part that an order by which the trial court directed DHS to prepare a conditional release plan and stated that it was " 'not making any ruling until I see what the proposed conditional release plan is' " was not a final order. *Id.* ¶¶ 17, 31. The appellate court reasoned that this order was nonfinal because it "did not adjudicate the conditional release issue

and merely continued the case for final resolution." *Id.* ¶ 31.

¶ 132    In this case, we find that the issue of whether a final order existed prior to the trial court's review and approval of the conditional release plan requires a simple application of the well-established rule that a trial court's ruling is final if it terminates the litigation between the parties and fixes their rights so that, if affirmed, the trial court has only to proceed with execution of the judgment. *In re Detention of Hardin*, 238 Ill. 2d 33, 42-43 (2010). An order is considered final as long as any matters left for future determination by the trial court are merely incidental to the ultimate rights that have been adjudicated by the judgment. *In re D.D.*, 212 Ill. 2d 410, 418 (2004).

¶ 133    Applying these rules, we conclude that the trial court's ruling of October 26, 2023, and written order of November 6, 2023, is not a final ruling or order. It neither terminated the litigation nor fixed the parties' rights such that the trial court would need only proceed with execution if we affirmed it. Instead, the order contemplated that future actions of a substantive nature would occur in the proceedings. Specifically, DHS and its contractor still needed to prepare a conditional release plan within 60 days, and the trial court still needed to review and approve that plan before respondent ultimately would be placed on conditional release. This need for future substantive determinations by the trial court renders this an interlocutory order.

¶ 134    We further find this interpretation to be consistent with the language of the Sexually Violent Persons Commitment Act. Under that statutory scheme, it is the commitment order that is the final and appealable judgment. See 725 ILCS 207/35(g) (West 2022) (providing that a judgment entered on the finding at trial that a person is a sexually violent person "is interlocutory to a commitment order under Section 40 and is reviewable on appeal"). While section 40(b)(2) provides that a commitment order shall "specify either institutional care in a secure facility *** or conditional release" (*id.* § 40(b)(2)), section 40(b)(3) provides for several things that must occur "[i]f the court

finds that the person is appropriate for conditional release." *Id.* § 40(b)(3). Specifically, a trial court must first notify DHS, which must then prepare a plan that identifies any treatment and services that the person will receive in the community and any needs for supervision, counseling, medication, community support services, residential services, vocational services, or substance abuse treatment. *Id.* Then, "[t]he plan shall be presented to the court for its approval within 60 days after the court finding that the person is appropriate for conditional release," unless additional time is requested. *Id.* Additionally, section 40(b)(5) provides that the trial court shall "order the person be subject to the following rules of conditional release, in addition to other conditions ordered, and the person shall be given a certificate setting forth the conditions of conditional release." *Id.* § 40(b)(5). The statute then enumerates 28 such rules and conditions to be included. *Id.* § 40(b)(5)(A)–(BB).

¶ 135   Under the above-described statutory scheme, the trial court's ruling of October 26, 2023, and written order of November 6, 2023, was in the nature of the "finding" contemplated by section 40(b)(3) that respondent was appropriate for conditional release. *Id.* § 40(b)(3). Such a finding is a statutory prerequisite to the preparation of a conditional treatment plan, which DHS must prepare and present to the trial for its approval within 60 days after the "finding" that conditional release is appropriate. *Id.* It is the order approving the conditional release plan and placing a person on conditional release plan that is final, not the earlier "finding" that the person is appropriate for conditional release.

¶ 136   Having decided this issue, we now return to respondent's argument that the trial court erred by denying his motion to dismiss the State's petition as legally insufficient despite the trial court's acknowledgement that, because respondent was not yet "on conditional release," section 40(b)(4) was technically not applicable. See *id.* § 40(b)(4). The State responds that the trial court acted

appropriately by looking beyond the label of its petition to its substance and correctly viewing it as a motion to reconsider an interlocutory order. The State contends that the petition was properly viewed as a motion to reconsider because it raised new evidence of an incident of sexual misconduct occurring a mere five weeks after the trial court had granted conditional release.

¶ 137     We agree with the State's argument. In determining the nature of a pleading or motion, courts are not bound by the title given to the document by a party; instead, it is the substance of the document that governs. *People ex rel. Ryan v. City of West Chicago*, 216 Ill. App. 3d 683, 688 (1991). Accordingly, citation to an inapt statute is not fatal because a court analyzing a party's request for relief should look to the substance of the request. See *In re Haley D.*, 2011 IL 110886, ¶ 67; *Pasquinelli v. Sodexo, Inc.*, 2021 IL App (1st) 200851, ¶ 27. That is what appears to have occurred in this instance, where the trial court stated that "however you want to style it," the State's petition had raised evidence of a new incident of sexual misconduct "that would certainly impact this court's decision to place him on conditional release." And because we have already held that the trial court's ruling as to respondent's eligibility for conditional release was merely interlocutory at this point of the case, it was a ruling that the trial court retained the inherent authority to modify as of that time. See *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 42 (a trial court retains the "inherent power to review, modify, or vacate interlocutory orders while the court retains jurisdiction over the entire controversy"). The trial court thus did not err by denying respondent's motion to dismiss the State's petition.

¶ 138     For similar reasons, we also reject respondent's argument, raised in the alternative, that the trial court was divested of jurisdiction to change his commitment status from conditional release to secure care because he filed a notice of appeal on November 13, 2023. Respondent relies upon the general rule that the filing of a notice of appeal divests the trial court of jurisdiction to enter

any order involving a matter of substance and causes the jurisdiction of the appellate court to attach *instanter*. See *People v. Rivera*, 2024 IL App (1st) 240520, ¶ 19. However, if the order appealed from is not final and appealable, the filing of a notice of appeal neither deprives the trial court of jurisdiction to proceed with the case nor vests the appellate court with jurisdiction to review. *State ex rel. Beeler, Schad & Diamond, P.C. v. Target Corp.*, 367 Ill. App. 3d 860, 863-64 (2006). Here, because respondent's notice of appeal was directed at an order that we have held not to be final, the trial court was not divested of jurisdiction to reconsider or change its finding concerning respondent's eligibility for conditional release.

¶ 139        Respondent's final argument is that, assuming the trial court properly proceeded to ruling on this issue, the State nevertheless failed to meet its burden of proving by clear and convincing evidence that the safety of others required that his conditional release be revoked. Section 40(b)(4) of the Sexually Violent Persons Commitment Act (725 ILCS 207/40(b)(4) (West 2022)) provides that, on a petition to revoke conditional release, "[t]he State has the burden of proving by clear and convincing evidence that any rule or condition of release had been violated, or that the safety of others requires that the conditional release be revoked." Respondent argues that he could not have violated any rules or conditions of release because no conditional release plan had yet been approved, and the State acknowledged in its closing arguments that it was not asserting any violation of such rules or conditions. Respondent likewise argues that because he was never in the community, the safety of others was never an issue within the contemplation of the statute. He also points out that Dr. Hernandez answered no when asked whether in her opinion the safety of others required respondent's conditional release be revoked.

¶ 140        In response, the State maintains its position above that this was a reconsideration of an interlocutory finding of conditional release based upon new evidence, and it argues that the trial

court properly exercised its discretion when it committed respondent to institutional care in a secure facility. A trial court's commitment decision is reviewed for abuse of discretion. *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 52. In determining whether commitment of a sexually violent person shall be for institutional care in a secure facility or for conditional release, the trial court is to consider the nature and circumstances of the behavior that was the basis of the allegation, the person's mental history and present mental condition, and what arrangements are available to ensure that the person has access to and will participate in necessary treatment. 725 ILCS 207/40 (b)(2) (West 2022).

¶ 141    Under either legal standard, we find no error in the trial court's ruling revoking its finding of conditional release and committing respondent to secure care. The trial court held an evidentiary hearing at which it found credible the testimony of Rhoades and Schmidt that respondent had engaged in two acts of exposure and masturbation in their presence, which occurred after the court had found him eligible for conditional release but before final approval of his conditional release plan. The trial court found it "very troubling" that these incidents occurred while his conditional release was under consideration by the court and stated that their timing led it to agree with Dr. Hernandez that respondent was "struggling to control his behavior" in a way that "if gone unchecked, could very well result in a likelihood of much re-offending." Accordingly, the trial court stated that it agreed with Dr. Hernandez's opinion that respondent was substantially probable to commit acts of sexual violence if placed on conditional release. We find the trial court's reasoning and ruling on this matter to be fully supported by the evidence.

¶ 142                              III. CONCLUSION

¶ 143    For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 144    Affirmed.